# In Re:

*ORLY GENGER*

*Main Case No. 19-13895-jlg*

---

*March 4, 2020*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

Min-U-Script® with Word Index

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  ORLY GENGER,                           Main Case No.

8         Debtor.                         19-13895-jlg

9

10  - - - - - - - - - - - - - - - - - - - - -x

11

12            United States Bankruptcy Court

13            One Bowling Green

14            New York, New York

15

16            March 4, 2020

17            10:16 AM

18

19

20

21  B E F O R E:

22  HON. JAMES L. GARRITY JR. (TELEPHONICALLY)

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    Case conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Clara Rubin

21    eScribers, LLC

22    352 Seventh Avenue, Suite #604

23    New York, NY 10001

24    (973)406-2250

25    operations@escribers.net

1

2  A P P E A R A N C E S:

3  REITLER KAILAS & ROSENBLATT LLC

4          Attorneys for Debtor

5          885 Third Avenue

6          20th Floor

7          New York, NY 10022

8

9  BY:   JULIE WLODINGUER, ESQ.

10

11

12  TARTER KRINSKY & DROGIN LLP

13          Attorneys for Deborah Piazza, Chapter 7 Trustee

14          1350 Broadway

15          New York, NY 10018

16

17  BY:   ROCCO A. CAVALIERE, ESQ.

18

19

20  CULLEN AND DYKMAN LLP

21          Attorneys for The Orly Genser 1993 Trust

22          100 Quentin Boulevard

23          Garden City, NY 11530

24

25  BY:   ELIZABETH M. ABOULAFIA, ESQ.

1

2  EMMET, MARVIN & MARTIN LLP

3        Attorneys for Sagi Genger and TPR Investment Associates,

4        Inc.

5        120 Broadway

6        New York, NY 10271

7

8  BY:   THOMAS A. PITTA, ESQ.

9        JOHN DELLAPORTAS, ESQ.

10

11

12  HUGHES HUBBARD & REED LLP

13        Attorneys for ADBG LLC

14        One Battery Park Plaza

15        New York, NY 10004

16

17  BY:   CHRIS GARTMAN, ESQ.

18

19

20  KASOWITZ BENSON TORRES LLP

21        Attorneys for Eric Herschmann, Esq.

22        1633 Broadway

23        New York, NY 10019

24

25  BY:   ERIC D. HERSCHMANN, ESQ.

1

2  LAW OFFICE OF IRA DANIEL TOKER

3          Attorneys for D&K GP LLC and Dalia Genger

4          420 Lexington Avenue

5          Suite 2400

6          New York, NY 10170

7

8  BY:   IRA DANIEL TOKAYER, ESQ.

9

10

11  POLLOCK COHEN LLP

12          Attorneys for The 1993 Orly Genger Trust

13          60 Broad Street

14          24th Floor

15          New York, NY 10004

16

17  BY:   ADAM POLLOCK, ESQ.

18

19

20

21

22

23

24

25

1
2   TOGUT, SEGAL & SEGAL LLP
3        Attorneys for Arie Genger
4        One Penn Plaza
5        New York, NY 10119
6
7   BY:   BRIAN F. MOORE, ESQ.
8        FRANK A. OSWALD, ESQ.
9
10
11  ALSO PRESENT:
12        SAGI GENGER
13        ORLY GENGER#, Debtor
14
15
16
17
18
19
20
21
22
23
24
25

1                    P R O C E E D I N G S

2           THE COURT:  All right, Orly Genger, Case Number 19-

3     13895.

4        (Pause)

5           MR. CAVALIERE:  Good morning, Your Honor.  Rocco

6     Cavaliere, Tarter Krinsky, on behalf of Deborah Piazza, the

7     successor Chapter 7 trustee.  Also with me is Deborah Piazza.

8           MS. PIAZZA:  Good morning, Your Honor.

9           THE COURT: All right.  Thank you.

10          MR. CAVALIERE:  Good morning.  There are a number of

11    people here today, Your Honor, so this might take a while.

12          MR. PITTA:  Good morning, Your Honor.

13          THE COURT:  Okay.

14          MR. PITTA:  Thomas Pitta Emmet, Marvin & Martin,

15    together with John Dellaportas, my partner, here on behalf of

16    Sagi Genger and TPR Investments.  And Mr. Genger is actually in

17    court with us as well.

18          THE COURT:  Okay -- whoa, whoa, whoa.

19          MR. PITTA:  Sorry.

20          THE COURT:  Okay, once second.  One -- hold it.  Your

21    last name again, please?

22          MR. PITTA:  It's Pitta.  P-I-T-T-A.

23          THE COURT:  All right.  And I know you have Mr.

24    Dellaportas with you.  And who are you representing?

25          MR. PITTA:  Sagi Genger and TPR Investments.  And Mr.

 1  Genger is in --

 2          THE COURT:  I'm sorry, the first name?

 3          MR. PITTA:  -- court with us.

 4          THE COURT:  S-E-G-I (sic) Genger?

 5          MR. PITTA:  S-A-G-I.  Yes.

 6          THE COURT:  Okay.  That's the debtor's brother; is

 7  that right?

 8          MR. PITTA:  Correct, Your Honor.

 9          THE COURT:  Okay.  And what's the other entity you're

10  representing?

11          MR. PITTA:  TPR Investments, which is a creditor in

12  the estate as well.

13          THE COURT:  Okay.  Thank you.

14          MR. OSWALD:  Good morning, Your Honor.  Frank Oswald

15  from Togut, Segal & Segal, with my colleague, Brian Moore.  We

16  represent Arie Genger, the debtor's father.

17          THE COURT:  All right.

18          MS. WLODINGUER:  Julie Wlodinguer --

19          THE COURT:  Hold it.

20          MS. WLODINGUER:  -- on behalf of the debtor.

21          THE COURT:  Hold -- excuse me.  Hold -- hold it.  Hold

22  it, please.

23          Mr. Oswald, who else do you have with you?

24          You have your colleague -- who's your colleague who's

25  with you in court?

```
 1              MR. OSWALD:  For Arie.

 2              MR. MOORE:  Brian Moore.

 3              MR. OSWALD:  Yeah, Brian Moore.  M-O-O --

 4              THE COURT:  Yeah, I got that.  Thank you very much.

 5              All right, next.

 6              MS. WLODINGUER:  Julie Wlodinguer from Reitler Kailas

 7      & Rosenblatt, on behalf of the debtor, Orly Genger.

 8              THE COURT:  All right, now, spell your last name,

 9      please.

10              MS. WLODINGUER:  W-L-O-D-I-N-G-U-E-R.

11              THE COURT:  Thank you.

12              MR. POLLOCK:  Good morning, Your Honor.  Adam Pollock

13      from Pollock Cohen, on behalf of the Orly Genger Trust.  And

14      with me today is -- I'll let her introduce herself.

15              MS. ABOULAFIA:  Good morning, Your Honor.

16              THE COURT:  Hold on one --

17              MS. ABOULAFIA:  Elizabeth Aboulafia from Cullen and

18      Dykman, also on behalf of the Orly Genger Trust.

19              THE COURT:  All right.  Spell your last name, please.

20              MS. ABOULAFIA:  A-B-O-U-L-A, F as in "Frank", I-A.

21              THE COURT:  Thank you.

22              MS. ABOULAFIA:  Thank you, Your Honor.

23              THE COURT:  All right.  Is there anyone else there?

24              MR. TOKAYER:  Good morning, Your Honor.  Ira Tokayer.

25      I represent D&K GP and Dalia Genger.  And I'm here on my own.
```

1          THE COURT:  Okay.  And I'm sorry, can you tell me who

2     you represent, again, please?

3          MR. TOKAYER:  D&K GP and Dalia --

4          THE COURT:  D?

5          MR. TOKAYER:  D&K GP --

6          THE COURT:  Okay.

7          MR. TOKAYER:  -- and Dalia, D-A-L-I-A, Genger.

8          THE COURT:  Right.

9          MR. TOKAYER:  That's the debtor's mom.

10          THE COURT:  Thank -- yes.  Thank you.

11          All right, is there anyone else there?

12          MR. GARTMAN:  Good morning, Your Honor.  Chris Gartman

13     from Hughes Hubbard & Reed.  That's G-A-R-T-M-A-N.

14          THE COURT:  And I'm sorry --

15          MR. GARTMAN:  And I'm on behalf of a third-party

16     litigation funder, ADBG LLC.  That is a party-in-interest.

17          THE COURT:  ADBG?

18          MR. GARTMAN:  That's correct.

19          THE COURT:  LLC.  Okay.

20          MR. HERSCHMANN:  Your Honor, Eric Herschmann, H-E-R-S-

21     C-H-M-A-N-N.  I'm here on behalf of myself.

22          THE COURT:  All right.  And what's your relationship

23     to the case?

24          MR. HERSCHMANN:  I am a creditor, and I happen to be

25     the spouse of the debtor.

1           THE COURT:  Oh.  Okay.  All right.

2           Anyone else?

3           All right, so again, thanks for coming in.  I'm sorry

4    I'm not able to be in the courtroom with you.  What I'd like to

5    do is start with either the trustee or her counsel, and give me

6    some overview of where things stand in the case.  I know

7    there're a lot of moving pieces.  I had a chance to read some

8    of the state-court documents, but I didn't -- I just was not

9    able to spend as much time as I had hoped to, doing that.

10           One of the things I am very curious about is the

11   status -- if I've got this right, the status of litigation

12   that's pending in the Southern District of New York.  Is there

13   pending litigation there?

14           MR. CAVALIERE:  Yes, Your Honor.  Rocco Cavaliere,

15   Tarter Krinsky & Drogin, here on behalf of the trustee.

16           THE COURT:  Hi.  All right.

17           MR. CAVALIERE:  There were two -- and I apologize,

18   Your Honor.  Feel better.  I'm sorry that you couldn't be here

19   today.

20           THE COURT:  Yeah, that's fine.  Thank you.

21           MR. CAVALIERE:  And I'll certainly provide a brief

22   background.  And I'm glad that you read some papers, Your

23   Honor, because I was drafting my presentation -- this is a --

24   this is a case -- this family that has been in litigation for

25   over fifteen years.  And as I was going through and tried to

1   identify all of the issues that have presented themselves, it

2   was really burdensome.  So I'll give you very high-level

3   background in a bit, but I want to respond to your direct

4   questions.

5            There were two --

6            THE COURT:  Are you with me?

7            MR. CAVALIERE:  -- surrogate-court matters --

8            THE COURT:  I'm sorry.  I'm sorry, I'm sorry.  Mr.

9   Cavaliere, just one second.  Let me just tell you what I would

10  like to accomplish today.  I know there -- I want to hear from

11  all of you, and then what I would like to get is an

12  understanding of what it is that each of you guys would like --

13  each of the parties would like to do in the case.  I know

14  there's some litigation there that --

15           Mr. Tokayer, I think you recently filed a complaint on

16  behalf of your clients in this matter.

17           And I want to get a sense, are all -- what all the

18  litigation is, and then think about how we're going to organize

19  it.

20           So I'm sorry to interrupt you, Mr. Cavaliere, but

21  please go ahead.

22           MR. CAVALIERE:  Okay.  No worries, Your Honor.

23           This case -- the bankruptcy case, as you know, started

24  in Texas in July.  And during the Texas proceeding, the prior

25  trustee removed two surrogate-court matters to the district

1   court in the Southern District.  Normally --

2          THE COURT:  Excuse me.  July 2019?

3          MR. CAVALIERE:  Yes.  The bankruptcy case commenced in

4   the Western District of Texas in July 2019.

5          THE COURT:  Okay.

6          MR. CAVALIERE:  And I believe it was October, before

7   this case transferred here, that the debtors -- I should say

8   the trustee -- the prior trustee, Ron Satija, directed his

9   proposed counsel to remove two surrogate-court matters to the

10   Southern District of New York.  The intention was -- and that

11   was based on the bankruptcy removal statute, Your Honor.  The

12   intention was to transfer those two matters, because they dealt

13   with property of the estate and claims-administration issues,

14   to the court in Texas.  Before that happened, the bankruptcy

15   court in Texas transferred the bankruptcy case here to the

16   Southern District of New York.

17          So those two matters that had been removed were

18   sitting before Judge Hellerstein.  And in February I spoke

19   to -- and those are matters that are being handled by the Orly

20   Genger trustee on behalf of the parties there on that one end.

21   And obviously, to the extent it deals with Orly Genger, the

22   bankruptcy trustee is the party with proper standing.

23          So we worked together to coordinate with Judge

24   Hellerstein, entered into a joint stipulation that refers those

25   matters here to the bankruptcy court, under the standing order.

1    It was just sitting there.  I think normally we would remove
2    things straight to the bankruptcy court.  Because of the
3    procedural posture here, they were not able to remove it to the
4    bankruptcy court, because that bankruptcy court wasn't pending
5    in the same state.

6          So those matters are actually, I believe -- I think
7    I'd have to maybe speak to Mr. Jenna (ph.), the clerk of the
8    court, unless Your Honor has a different suggestion, to
9    coordinate with the district court, because there has been an
10   order entered, referring those matters here, but they have not
11   yet hit the docket, Your Honor.

12         THE COURT:  All right.  Okay, so we can look into
13   that.

14         MR. CAVALIERE:  Okay.  Then --

15         THE COURT:  And when -- do you know -- do you know --
16   excuse me.  Do you know when the order was issued by Judge
17   Hellerstein?

18         MR. CAVALIERE:  I didn't hear you, Your Honor.  I'm
19   sorry.

20         THE COURT:  I'm sorry.  Do you know when the order
21   sending up the cases was entered by Judge Hellerstein?

22         MR. CAVALIERE:  Yes.  It was -- there's a stipulation
23   and order; it was signed on February 18th.

24         THE COURT:  Oh, all right.  So it's very recent.

25         MR. CAVALIERE:  Yes, Your Honor.

1            THE COURT:  Okay.  All right, we'll look into that.

2            MR. CAVALIERE:  Okay.  So --

3            THE COURT:  So, wait.  On the surrogate matters, these

4    were matters that are -- that had been pending in the New York

5    State Surrogate's Court?

6            MR. CAVALIERE:  That is correct, Your Honor.

7            THE COURT:  All right.  And who -- what did it

8    involve?  Or what do they involve?

9            MR. CAVALIERE:  Your Honor, they involve a number

10   of -- a number of matters.  In one instance, it is -- there's a

11   pending petition, I believe, to remove Dalia Genger as the

12   trustee.  There are also breach-of-fiduciary-duty claims that

13   have been asserted by Orly Genger against the mother, Dalia

14   Genger.  There are potential cross-claims filed by the other

15   side against the debtors, which have an impact on objections to

16   claims.

17           And in addition, one of the surrogate-court matters

18   addresses an application by Dalia Genger against various

19   parties, including the litigation funder, Mr. Gartman's client,

20   as well as the current owner of TRI Resources (sic), The Trump

21   Group.  They're not affiliated with the president, Your Honor,

22   but had purchased the shares of TRI Resources.

23           There is -- as you may have seen from the documents --

24   and I'll certainly provide more color to this if Your Honor is

25   not aware -- there's a possibility that the debtor may be

1    entitled to some proceeds of a note, as a result of that 32.3-

2    million-dollar settlement that was in the papers.  And there

3    was an application by Dalia Genger to essentially enjoin The

4    Trump Group from making payment to the payees in that

5    litigation.

6          So that's all pending in the surrogate court.  As I

7    understand it, some of these things could have been presented

8    in state court elsewhere, but they did find their way in the

9    surrogate court.

10         THE COURT:  All right, what's the surrogate -- what

11   was the basis -- just forgive me; I'm not that familiar with

12   the scope of the Surrogate's Court jurisdiction.  But how did

13   it end up -- this is a dispute over somebody's will?  How did

14   it end up in the Surrogate's Court?  And I'll hear from anyone

15   who has a quick answer to that.

16         MR. CAVALIERE:  Sure.  I'll give you my view of it.

17   And certainly the parties that have been involved in this

18   litigation -- the surrogate-court matter started in 2009 --

19   certainly correct anything I've said about what's pending

20   there.  But the reason why it ended up in surrogate court's

21   because the dispute, at least initially, centered on the

22   breaches of fiduciary duty by -- or actions by and between

23   beneficiaries of a trust, the Orly Genger Trust.  And that's

24   why it ended up in surrogate court initially.

25         THE COURT:  Okay.  All right, thank you.  I didn't

 1  mean to interrupt you, but you were summarizing the various

 2  matters.

 3          MR. CAVALIERE:  Okay.  Yes.  And I think Mr. Pollock

 4  is here on behalf of the Orly Genger Trust, and perhaps he can

 5  provide a little more color as to those surrogate-court

 6  proceedings, to amplify --

 7          THE COURT:  All right.

 8          MR. CAVALIERE:  -- the record.

 9          THE COURT:  That'd be great.

10          Mr. Pollock?

11          MR. POLLOCK:  Good morning, Your Honor.  We represent

12  the Orly Genger Trust.  We were not --

13          THE COURT:  And I'm sorry, Mr. Pollock -- I'm sorry --

14  Mr. Pollock, I'm sorry to interrupt you.  Just because -- to

15  make sure that, when we get the transcript of this, it's clear

16  who's speaking, just note your appearance before you start to

17  speak, please.

18          MR. POLLOCK:  Absolutely.  Thank you, Your Honor.

19  Adam Pollock on --

20          THE COURT:  Thank you.

21          MR. POLLOCK:  -- behalf of the Orly Genger Trust.  We

22  represent the --

23          THE COURT:  Thank you.

24          MR. POLLOCK:  We represent the successor trustee and,

25  frankly, we're successor counsel.

1          So I don't have the full picture of the origin of

2   those cases in the Surrogate's Court, but my understanding is

3   that the Surrogate's Court jurisdiction includes not just

4   decedents but also trusts in estate matters.  So that would

5   explain why they started there.

6          We have consented to the referral of those matters to

7   the bankruptcy court to hear our pending remand motions,

8   because we think that these are basically core Surrogate's

9   Court -- Surrogate's Court matters and core Surrogate's Court

10  jurisdiction.  And there's the probate exception to federal-

11  court jurisdiction.  That said, I don't think we need to

12  completely address them today.  We have our pending motions

13  and, if necessary, we can get into the motion practice on that.

14  The trustee hasn't yet responded to those pending motions.

15          THE COURT:  All right.  Thank you.

16          MR. CAVALIERE:  Your Honor, since we're talking about

17  other pending cases, if you just -- if you want to go through

18  the other --

19          THE COURT:  Yes --

20          MR. CAVALIERE:  -- matters, we can do that.

21          THE COURT:  Yeah, excuse me, Mr. Cavaliere?

22          MR. CAVALIERE:  Yes.

23          THE COURT:  Okay, note that, please.

24          UNIDENTIFIED SPEAKER:  Your name.

25          UNIDENTIFIED SPEAKER:  Name.

1        MR. CAVALIERE:  Oh.  I apologize.  Rocco Cavaliere,

2   Tarter Krinsky, on behalf of the trustee.

3        THE COURT:  Thank you.

4        MR. CAVALIERE:  My apologies.

5        Your Honor, there's also three pending discharge

6   actions that were filed in this court.  I believe that there's

7   pre-trial conferences scheduled in those, commenced by Dalia

8   Genger, the mother; Sagi Genger, the brother; and Orly Genger,

9   trustee, not Deborah Piazza but Mr. Pollock's client.

10        THE COURT:  All right, and these -- I'm sorry to

11   interrupt you.  These are actions that were commenced after the

12   cases came to New York?

13        MR. CAVALIERE:  The actions actually started -- I

14   believe they were commenced in October, before the transfer

15   took place.  The transfer order in Texas was signed in

16   November, and it took a month, from November 5th till about

17   December 11th, before they arrived here in the Southern

18   District.  And Deborah Piazza was appointed at that time as a

19   successor trustee.

20        THE COURT:  All right, and what are the -- what are

21   the dates of our pre-trial conferences?

22        MR. CAVALIERE:  Your Honor, I believe -- and I'm not

23   involved in those.  The trustee did not bring those actions.

24   But I do know that the status conferences -- or pre-trial

25   conferences in those actions is April 7th.  I'm not aware --

1    the debtor's counsel is here; it's defending those actions.  I

2    don't know whether service has been done.  And other parties

3    can speak to that.

4              THE COURT:  Okay.  All right.

5              MR. CAVALIERE:  My hope, Your Honor, just because

6    there are issues that -- factual issues that arise in those

7    actions, that could implicate other matters in this case as we

8    try to maximize value, that the parties would agree to push

9    those discharge actions out, with the Court's permission, while

10   we focus on other things.

11             THE COURT:  All right.

12             MR. CAVALIERE:  Okay?  And others, obviously, can jump

13   in and speak as to that at the appropriate time.

14             There's also separately an action commenced by Dalia

15   Genger, the mother, against Orly Genger, the debtor; Michael

16   Bowen, who is a partner at Kasowitz, a partner of Mr.

17   Herschmann, the debtor's husband; Arie Genger; Arnold Broser;

18   David Broser; Eric Herschmann; The Genger Litigation Trust;

19   ADBG; TEDCO; and Deborah Piazza; seeking to impose a

20   constructive trust on the 32.3-million-dollar proceeds from

21   that settlement reached between -- back in -- I think it was

22   June 2013.

23             THE COURT:  All right.

24             MR. CAVALIERE:  And as far as I know, I don't believe

25   we've been served.  And I was told, at least initially, by

1   counsel in this case, not Dalia Genger's counsel but another

2   counsel, that it was simply filed to preserve a statute-of-

3   limitations potential issue and that the parties -- the hope

4   was that the plaintiff would allow that to remain stagnant

5   while the trustee continues the administration of the case.

6   Mr. Tokayer's here, can speak to that if you'd like.

7               THE COURT:  Okay.  All right.

8               MR. CAVALIERE:  Okay, he's -- I guess, presumably he

9   doesn't want to speak to it.

10              MR. TOKAYER:  I think everybody's just figuring -- you

11  do yours and then everybody --

12              MR. CAVALIERE:  Okay.  So I think that --

13              THE COURT:  Yeah.

14              MR. CAVALIERE:  -- what the parties have decided -- it

15  just makes sense for me to complete my presentation, and

16  everyone will speak thereafter.

17              THE COURT:  I think that's fine.  So we just -- just

18  to recap; so far we have two surrogate matters, the three

19  discharge cases, the -- I'll call it the constructive-trust

20  action.  Right?

21              MR. CAVALIERE:  Yes.

22              THE COURT:  I haven't missed anything.  Okay.  So

23  we'll keep moving.

24              MR. CAVALIERE:  The next one -- there's an adversary

25  proceeding -- again I'm not involved in this -- Kasowitz v.

1   Sagi Genger.  This relates to a motion to quash a subpoena;

2   believe a subpoena that was served during the bankruptcy case

3   before it got to New York.  And I'm not sure whether -- I don't

4   believe that that's been resolved.  I think it's just sitting

5   there for further -- to the extent it needs to be addressed in

6   the future.

7            THE COURT:  All right.

8            MR. CAVALIERE:  There's also, Your Honor, just -- and

9   I haven't really studied these cases.  I have spoken to

10  Kasowitz about them.  There are two Supreme Court cases that I

11  believe both of them are before Judge Barbara Jaffe#, relating

12  to affirmative claims that Orly Genger has against, in one

13  case, Sagi Genger, and another case against Dalia Genger.  In

14  those cases -- the second case against Dalia Genger, Sagi

15  Genger, D&K, and TPR.  They deal with fraudulent-inducement

16  claims, they deal with breach-of-fiduciary-duty claims, and

17  fraud claims.  Those cases -- some of them -- I believe the

18  claims for some of them are pending; some may be on appeal.

19  But these are cases in which Orly Genger is the plaintiff.  And

20  I believe they're just kind of pending.  And the trustee has

21  not yet decided how to proceed with respect to those.

22            I think, frankly, Your Honor, part of the issue

23  here -- this has been a fifteen-year saga.  This Genger family

24  litigation has taken up the courts' times (sic), and we think

25  it's about two or three dozen courts over the course of the

1   last fifteen years.  It may be more than that, frankly.  So

2   there's litigation everywhere.  And we're hoping -- the fact

3   that we haven't focused on that -- we will focus on it, but

4   we've been trying to focus on some other things in the case,

5   including -- I get to it -- the Broser money; that's the

6   settlement proceeds that is at play here, the alleged

7   fraudulent transfer of the thirty-two million dollars.  That's

8   been our initial focus.

9            But we will look into these cases a bit later.  We

10  have two years to do so, but we're not waiting that long.  But

11  we just haven't had a chance to really study these cases,

12  although we've had some initial discussions with debtor's prior

13  counsel.

14           THE COURT:  Okay.

15           MR. CAVALIERE:  So, Your Honor, there's also another

16  case that's now before -- it's Magistrate Freeman, but it's --

17  Judge Vyskocil has the case -- just recently assigned -- that

18  may have an impact on our case.  The debtor is not a party to

19  it, but the claims asserted therein may have an impact on our

20  bankruptcy estate.  The name of that case is Manhattan Safety

21  Maine, Inc. v. --

22           THE COURT:  Manhattan what?  I'm sorry?

23           MR. CAVALIERE:  Manhattan Safety --

24           THE COURT:  Okay.

25           MR. CAVALIERE:  -- Maine -- spelled M-A-I-N-E -- Inc.

1   v. Michael Bowen, Arie Genger, the two Brosers, The Genger

2   Litigation Trust, ABDG, and TEDCO.  And that's an action

3   brought by an assignee of the Orly Genger Trust, who is --

4   Manhattan Safety Maines is an alleged creditor of the Orly

5   Genger Trust and is prosecuting these various parties to

6   recover the 2013 settlement proceeds against these parties.

7           This action potentially implicates the automatic stay.

8   Worked with Mr. Pollock, who is lead counsel to Manhattan

9   Safety Maine.  He's also lead counsel to the Orly Genger

10  trustee, so represents two separate parties:  the main creditor

11  of the Orly Genger Trust -- or the alleged creditor, I should

12  say, and also the Orly Genger trustee.  And he has been --

13  agreed to an interim stay every forty-five days.  We've agreed

14  to push that out until March 30th.  Nothing will happen in that

15  case until we have a determination on how to proceed in our

16  bankruptcy case, because the Brosers and Arie Genger, who are

17  the parties that are alleged to have received the bulk of the

18  thirty-two million dollars -- and let me say to break --

19  seventeen million of the thirty-two million was allegedly

20  received by those parties, in which case they may be pursued as

21  far as reconveyances.  There's a question as to whether those

22  are monies that belong to the property -- that is property of

23  the estate under the bankruptcy case, or whether those are --

24  that's property of the trust.

25          And separate and apart from that, there's a fifteen-

1    million-dollar note due from The Trump Group, that is also --
2    there's a question as to whether that should go to the
3    bankruptcy estate or to the Orly Genger Trust.  And there's
4    allegations that perhaps it should go to The Genger Litigation
5    Trust, which is a separate entity that Arie Genger and the
6    Brosers and Orly Genger were part of.

7              So, obviously there's a dispute with respect to
8    ownership of these claims, and there's a basis by which that
9    should remain stayed.  And I don't anticipate any issue with
10   Mr. Pollock continuing to stay that perhaps for a longer period
11   of time as opposed to doing it every forty-five days.  But I
12   can discuss that with him after the hearing.

13             THE COURT:  All right.  Thank you.

14             MR. CAVALIERE:  Your Honor, I believe that's
15   essentially where -- as far as pending actions.  There is -- I
16   believe the other actions are stayed.  There's an action before
17   Judge -- it was previously Judge Forrest; it's now Judge
18   Broderick.  It's Dalia Genger v. Sagi Genger, v. Orly Genger.
19   This was the case that led to the judgment by (sic) Sagi Genger
20   in 2018, which was confirmed by -- which was affirmed by the
21   Second Circuit in June, I believe, of 2019, and led to the
22   filing of the bankruptcy case.  He obtained a judgment for 3.5
23   million dollars, arising from an indemnity obligation of Debtor
24   Orly Genger.  This related to an agreement between Dalia Genger
25   and Sagi Genger that, when shares of the family enterprise, TRI

1   Enterprises (sic), were contributed to both the Orly Genger
2   Trust and to the Sagi Genger Trust in 2004 when Dalia and Arie
3   got divorced, as part of that divorce proceeding, there was a
4   separate agreement that, in light of the fight that Dalia, the
5   wife, who's allowing these contributions to take place to the
6   son and the daughter -- that the separate agreement was reached
7   that, when she needed money and when she made a demand for
8   money, if these shares ever were liquidated -- that initially
9   Sagi would have to pay directly, and then Orly would have to
10  indemnify Sagi for half of the amounts demanded by the mother.
11  Judge Forrest determined that was a valid obligation and,
12  thereafter, after exhausting all appeal rights, the debtor
13  determined that it was appropriate to file for bankruptcy in
14  July of 2019.

15          So that matter is stayed.  I don't think that that's
16  moving forward.  I don't believe it's closed but I do believe
17  it's stayed.  And a separate action commenced by Sagi Genger
18  against the Brosers, The Genger Litigation Trust, and ADBG
19  also -- a separate action, so -- to pursue the 17.3 million
20  dollars, was brought by Mr. Sagi Genger, I guess in his
21  capacity as judgment creditor of the debtor.  They're covering
22  all their bases here, Your Honor.

23          Manhattan Safety Maine has got the -- was pursuing
24  them for fraudulent transfers.  So to the extent it was the
25  Orly Genger Trust cause of action, then Sagi Genger was pursing

1  these people.  This turned to be an Orly matter -- an Orly

2  action.  Obviously, because the case was filed, the trustee is

3  now the party with proper standing to pursue those rights

4  against the Brosers, also known as the -- who own that entity,

5  ABDG, that Mr. Gartman represents.

6          THE COURT:  Okay.

7          MR. CAVALIERE:  Okay.  So that's what -- I believe

8  I've covered, I think, everything.  All the pending cases I --

9  obviously, if I missed one or two, Mr. Dellaportas, who's here

10  on behalf of Sagi Genger, who's been involved in this

11  litigation for over eleven or twelve years, can -- and Kasowitz

12  is also here.  They can supplement the record in that regard.

13          THE COURT:  All right.

14          MR. CAVALIERE:  Okay.

15          THE COURT:  So just so that -- just so that you and I

16  are clear; I think I count twelve actions:  the two surrogate;

17  the three pending discharge actions; the -- what I'm referring

18  to as "constructive-trust action"; the Kasowitz cross to the

19  subpoena action; two actions in the New York State Supreme

20  Court; one in the district court, in front of Judge Vyskocil;

21  and then two that are in the district court, brought by Sagi.

22  Is that right?

23          MR. CAVALIERE:  Yes, that's correct, Your Honor.  And

24  as you were speaking, something brought to my attention another

25  one that I was aware of and I forgot to mention.

1            THE COURT:  Okay.

2            MR. CAVALIERE:  There was -- there's another action

3    before Judge Broderick, commenced by Recovery Effort, Inc.,

4    which is, as I understand it, an entity that is owned by the

5    Orly Genger Trust.  It was an entity that was formed in 2019.

6    And they're bringing an action, a malpractice and breach of

7    fiduciary duty and aiding and abetting, breach-of-fiduciary-

8    duty action against the prior law firms of the debtor.

9    Zeichner Ellman & Krause is one of those firms, and another

10   firm is Wachtel Missry.  And these are the firms that

11   represented the debtor, Orly Genger, in connection with that

12   2013 settlement that's been very -- is very controversial here

13   and may be one of the bigger recoveries in this case, unless

14   Your Honor were to determine that didn't belong to the debtor

15   and it belonged to the Orly Genger Trust.

16           So that action is proceeding.  I believe there was a

17   complaint filed against those firms.  They filed motions to

18   dismiss.  And Recovery Effort, Inc. filed an amended complaint;

19   I believe on February 20th or thereabouts.  I had some initial

20   discussions with counsel to the Orly Genger Trust -- that's Mr.

21   Pollock -- and indicating I had some concern that potentially

22   this could be a violation of the stay insofar as it could be

23   determined that the alleged malpractice -- which we have not

24   investigated at all to determine whether they've committed any

25   malpractice, by the way, but to the extent that that is also a

1    potential recovery for the estate.  I haven't yet made a

2    determination.  I haven't talked to the trustee about that,

3    frankly, yet.  And that is something that's tabled right now,

4    as far as -- what I mean, that those discussions with Mr.

5    Pollock have been tabled for the time being.  We're going to

6    see where things go from here today.

7           And they've heard me out as to my concerns, and

8    that -- we'll either go forward or perhaps be stayed.  And if I

9    really feel strongly about it, perhaps I'll come to the Court

10   and ask for the Court to intervene, and raise my objections

11   formally.  But I'm hoping that that will be addressed to our

12   satisfaction with some cordial discussions.  I've had some --

13   so far, I've been working well with the counsel, Mr. Pollock,

14   so I anticipate and hope that that will continue, going

15   forward.

16          THE COURT:  All right.  Now, one of the things I would

17   like and I'd ask all of you work together on is putting

18   together for me -- it can be in chart form or it could just be

19   a summary, just -- a description of all of these actions.  And

20   I don't need it detailed.  It could be really just walking

21   through the surrogate-court actions, you know, who the parties

22   are, and what the status is, and to go through and identify

23   each of the discharge actions, et cetera.  Is that something

24   that you folks think you can put together for me?

25          MR. CAVALIERE:  Oh, absolutely, Your Honor.  I'll

```
 1   take -- as trustee's counsel, I'll take the first stab at it,
 2   and then I'll circulate it to the parties to correct it.  I'm
 3   sure there'll be some revisions.  Again, I'm new to the case,
 4   but -- and we'll get that over to the Court.  Does Your Honor
 5   have a view as to when Your Honor would like to see this chart?
 6            THE COURT:  I don't.  There's no rush to it.  Just,
 7   you know, to -- we're going to now figure out, after I hear
 8   from everyone, how we're -- when we're next going to get
 9   together and what we hope to achieve.  So we can trigger it off
10   of that.
11            MR. CAVALIERE:  Fair --
12            THE COURT:  So --
13            MR. CAVALIERE:  Okay.  Fair --
14            THE COURT:  All right?  So -- now, I know there're a
15   lot of you who probably wish to be heard.  Does anyone object
16   if I just go through the -- does it make sense for me to just
17   walk through it -- just ask the parties in the order that
18   people noted their appearances, or is there a better way to do
19   it?
20            MR. CAVALIERE:  Your Honor, it's Rocco Cavaliere
21   again.  I'm happy to proceed however you'd like.  If I can
22   just -- I think -- initially you had asked where we are.
23   Before we turn the --
24            THE COURT:  Oh, yes.
25            MR. CAVALIERE:  -- turn the podium over to others, I'd
```

1  like to just give you a little summary of what we've done so

2  far -- Tarter Krinsky -- to try to administer this case.  It'll

3  be a short presentation.  And --

4          THE COURT:  No, no, no, that -- I apologize.  I

5  thought you were done.  So I apologize.  No, please go right

6  ahead.

7          MR. CAVALIERE:  Okay.  So, Your Honor --

8          THE COURT:  Take as much -- take as much time as you

9  need.

10          MR. CAVALIERE:  Okay.  Thank you very much, Your

11  Honor.

12          So, Your Honor, this is -- a trustee's been appointed

13  in hundreds of thousands of cases over the years.  You've been

14  on the panel for, I -- dozen years.  And I don't think we've

15  ever seen a case like this before.  This is a litigation that's

16  been spanning for over fifteen years.  And if some parties have

17  their way, they'll continue litigation for five to ten more

18  years.

19          Fortunately, we're at -- with the filing of the

20  bankruptcy, we have a uniform -- we have one court that can

21  perhaps end this nightmare of litigation.  And I'm sure state-

22  court judges and district-court judges are -- well, I don't

23  know this for sure -- have been rejoicing about the fact that

24  they haven't had to deal with too many Genger litigation

25  matters since July, since the bankruptcy filing.

1        Within a few days of the appointment of Ms. Piazza, we

2   started rolling up our sleeves and we started looking at these

3   cases, at this bankruptcy case as well as the other state-court

4   and federal-court cases that are pending, as well as those that

5   have concluded, that may give rise to information that'd be

6   helpful in the administration of the case.

7        We had calls, right from the start, with the major

8   parties-in-interest, with Sagi Genger's counsel, with the

9   Brosers, with Arie Genger's counsel.  And then we met with most

10  of the parties, most of whom we met with in January.  And I met

11  with some other folks in February; I met with Mr. Herschmann

12  after he completed his impeachment work for the president in

13  January.  Had an opportunity to meet with me in February.

14       One of the matters that we had to focus on, Your

15  Honor, was the settlement that was reached by the trustee in

16  this bankruptcy case before it was transferred.  Judge Davis

17  transferred the case and did not rule on the settlement motion.

18  But there are several objections on file, which we took quite

19  seriously.

20       So our intent, and as we said to all the parties right

21  from the start, is -- it's going to take us a little time to

22  get up to speed, in light of the history of this case, but that

23  we believed that there was going to be a need to improve the

24  settlement consideration that was reached by the prior trustee.

25       And so we've -- essentially from mid-December to early

1    February, while we met with some parties, most of our work was

2    really to do homework, to understand the positions.  And we

3    didn't really start the negotiations with the parties to

4    improve the settlement, until early to mid-February.

5           And just by way of background; the settlement terms,

6    Your Honor -- we're dealing with two -- there's three, four

7    aspects to it that we were trying to improve.  And I'll just go

8    over what the prior trustee's settlement was and -- so they

9    understand what those terms were.  And obviously, I can't get

10   into what the current posture is, but I have reported to the

11   parties that -- to the Sagi Genger team, that we are making

12   process and we're hopeful that within a few more weeks we'll

13   have potentially a much-improved settlement that I'd like to be

14   able to present to the Court at the next conference date,

15   perhaps April 7th, which is the date that we have for the pre-

16   trial conferences on these matters.

17          But the settlement that was reached by the prior

18   trustee was in connection with the fraudulent transfer against

19   the Brosers, a 1,000,000-dollar settlement, of which 250,000

20   dollars would be paid within ten days of approval of a

21   settlement, and another 750,000 dollars to be paid when the

22   Brosers, or ADBG, the entity, was to receive 750,000 dollars

23   from the proceeds of the Trump note.  So there's this Trump

24   note that is -- in the face of it, there're two notes -- 7.5

25   million each -- in total, of 15 million, that's still due to be

1    paid by The Trump Group.

2           The settlement agreement, 2013, provided that The
3    Trump Group did not have to make payment until the Sagi Genger
4    group -- which is defined to include Dalia, the mother; Sagi,
5    the brother; the trustees of the various trusts.  They had to
6    provide the leases to The Trump Group, because The Trump Group
7    was involved in all these other litigations, but, for The Trump
8    Group, would agree to pay any of this money to the settling
9    parties:  the Brosers, Arie Genger, and Orly Genger.

10          And so that money's been held up.  And in the
11   meantime, while litigation's continued, Orly Genger provided --
12   agreed to secured claims and the filing of UCCs by the Brosers,
13   of about 4.5 million dollars.  And then Eric Herschmann, who's
14   also a secured creditor for two million, to the extent that any
15   of those Trump monies come in, he theoretically has a right to
16   recover that.  And then separately, Arie Genger, third in line
17   because there's an intercreditor agreement between these three
18   parties, asserted (ph.) a couple 5.4 million.  And that will
19   leave three million left.  But, Your Honor, Trump Group, which
20   is represented by Skadden -- they know what they're doing when
21   they draft settlement agreements, and they preserved themselves
22   an indemnification obligation under the settlement agreement,
23   which gave them the ability to offset any other legal fees
24   that're incurred from that point forward.  And they have
25   incurred three million dollars in legal fees.

1          So in some respects, this is a draining asset.

2    There's still a lot of money left.  But there are still some

3    pending actions against The Trump Group they're defending and

4    trying -- and have pending motions to dismiss on.  So that's

5    money that ultimately we're hoping comes in; we don't know when

6    it will but, when it does, in connection with that 1-million-

7    dollar settlement I was speaking about, the Brosers, to the

8    extent that their lien is valid, would then -- if they were to

9    receive the 4.5 million dollars that they claim to be entitled

10   to, 750,000 of that would be paid to the estate.

11         In addition, the debtor's husband, Eric Herschmann,

12   had, in 2012, 2013 (ph.), purchased a condo in Texas.  Was his

13   homestead.  It's where his adult children live, as well.  He

14   met the debtor, I think, around -- shortly thereafter.  And

15   they married in 2016; September 2016.  At or around the time of

16   the marriage, I guess what all good husbands do -- in

17   hindsight, perhaps he shouldn't have done it -- he contributed

18   one-half of his interest in his home to the debtor.  So the

19   debtor has a one-half interest in this condo, the value of

20   which is anywhere between -- obviously the Sagi Genger side

21   says about 3.5 million.  Mr. Herschmann believes it's worth 2.4

22   to 2.5.  The trustee is analyzing it.

23         But at the time that the gift was provided to the

24   debtor from the husband, he did preserve for himself four

25   parking spots and storage units.  So the value to the estate is

 1    reduced by virtue of the fact that the debtor doesn't have an

 2    ownership right in those parking spots and garage and storage

 3    units, who are, as I understand it, quite valuable.

 4         So we are working with Mr. Herschmann, as well, to

 5    improve the consideration that he agreed to provide, and what

 6    he agreed to provide to the prior trustee was 200,000 in cash.

 7    In addition -- and it was all a fully integrated settlement

 8    agreement.  Because he believes he has a right to a lien on

 9    that money that would come in from the Brosers -- from the

10    Trump monies, he agreed that any monies that the Brosers

11    provide to the estate -- that's about a million dollars -- plus

12    the 200,000 he was contributing -- he has a lien on all

13    litigation proceeds of the debtor, but he would waive his right

14    to a preference and priority on that money so that it could be

15    available for the estate and in the order of priority under the

16    Bankruptcy Code.

17         Another aspect of that agreement, which is one of the

18    more controversial aspects of it, was the settlement agreement;

19    controversial insofar as Sagi Genger team raised a number of

20    issues.  Kasowitz Benson, which is debtor's former counsel, in

21    which Mr. Herschmann's a partner, had agreed to represent the

22    prior trustee on a contingency basis at thirty-three percent,

23    to pursue potential claims against Sagi, the brother; and

24    Dalia, the mother.  And those two -- I believe they would

25    continue in those two state-court matters I spoke of earlier.

 1   And there were fierce objections to those -- to that aspect of

 2   the settlement.  And in addition, there were -- there's a

 3   separate retention application that was on file, in (sic) which

 4   there were objections.  And that never got decided by Judge

 5   Davis.

 6          So those are the aspects that -- so what we'll be

 7   doing, Your Honor, is going back to the parties, because we

 8   have potential targets here that have reached a settlement with

 9   the prior trustee.  And we respect the process.  While the

10   prior trustee's settlement was viewed as objectionable by some

11   creditors, there was a lot of time and effort put into that.

12   And we believe that the first step is to try to improve it if

13   we could.  And that's what we've been focusing on to try to

14   improve that settlement.  Whether the current structure will

15   remain in place or whether some portion of it would be removed,

16   that remains to be seen.  But we are making some progress.  We

17   have actually made some significant progress.

18          Another aspect of our settlement that was

19   controversial was Arie Genger was to keep his secured claim.

20   We're also discussing Arie Genger's consideration, if any, with

21   respect to an improved settlement.

22          So we are -- certainly we believe we're making some

23   progress here.  And what I've asked the parties to do is to

24   allow the trustee, who has two years, really, to bring actions

25   and to do an investigation, to stay any litigation efforts, any

1   contested matters, to allow the trustee to do the job that
2   she's entitled to do as a trustee, to maximize value for all
3   parties.  And for most (indiscernible) I've been getting
4   cooperation, but unfortunately yesterday there was an
5   expectation, apparently, by Sagi Genger that we would have a
6   fully baked and resolved settlement by today.  That was
7   certainly our intention.  We tried to do so.  But there're just
8   many moving parts, and I think, in light -- and as, frankly,
9   evidence of arm's-length negotiations that we're having with
10  the other side.  We haven't gotten there yet, but we're making
11  progress.

12          And as you know, Your Honor, the case was transferred
13  here because Sagi Genger, the brother, filed a motion to
14  dismiss or, in the alternative, to transfer venue.  Judge Davis
15  decided he would not dismiss the case, and he accepted that
16  alternative relief -- granted that alternative relief of
17  transfer.  I think, on the face of the motion to dismiss, it
18  was -- it was styled "motion to dismiss or grant" -- "transfer
19  venue".  They got their relief.  Judge Davis did say that he'll
20  let Your Honor decide on dismissal and when that should take
21  place.

22          And I'm told that they would like to try to get -- and
23  they'll speak for themselves -- seek from the Court the right
24  to schedule a hearing on a motion to dismiss.  And in that
25  regard, Your Honor, they've already taken upon themselves,

1    hoping that Your Honor agrees to schedule a motion to dismiss,

2    to send nine subpoenas out to nine different firms, which is

3    frankly another example of the litigation tactics that have

4    been going on for fifteen years but we, frankly, don't need in

5    this case.

6              Trustee's moving quickly and doing her job.  And we're

7    hoping that the Court -- and I'll certainly be heard later

8    after the parties speak to this -- and hope that the Court

9    delay any hearing for a considerable period of time on the

10   motion to dismiss, to allow us to do our work; would put

11   back -- perhaps with any luck, we reach a settlement that is

12   very favorable and everyone is okay with.  And to the extent

13   that it's a settlement that the parties are not in favor of,

14   they'll have their rights, under the law, to object to

15   settlements.  But to use a motion to dismiss as a litigation

16   tactic, to try to hold it over the trustee's head, is simply

17   not going to work, and it's going to have an actual deleterious

18   effect on this estate, which may give rise to certain actions

19   the trustee may need to take.

20             So we're hoping that we can calm the waters and

21   continue to keep it calm while we continue the administration

22   of the estate.  And we're hoping that, if Your Honor allows, we

23   can come back on April 7th and we can, during this next month,

24   focus all of our efforts and energies on improving that

25   settlement, presenting to the Court what those settlement terms

1   are, and then scheduling, hopefully, a hearing on the

2   settlement motion, some time thereafter.  Thank you, Your

3   Honor.

4           THE COURT:  All right.  Thank you.  Now, what I would

5   like to do -- so I'd like to hear briefly from each of the

6   parties -- because what I think the way I want to proceed here

7   is to adjourn this -- after I've heard from you, of course, is

8   to adjourn this until the 7th.  What I'll ask for is, prior to

9   that, two weeks ahead of time, that I get submissions -- we can

10  call them status; we can figure out how to style it.  But it

11  basically -- from my perspective, it's being heard from the

12  parties telling me what it is they would like to do, and what

13  they think as far as moving forward is concerned.

14          I'm happy to hear about it briefly right now, but I

15  would like to have that so that I have a sense for what the

16  thinking is as it relates to the thirteen -- or as many of the

17  thirteen actions as we can address.

18          Now, having said that, I just repeat my question, is:

19  does it make sense to move forward just along the order of the

20  folks who have appeared on this?  Is that -- does anyone object

21  to proceeding that way?

22          MR. CAVALIERE:  I think that's fine, as long as people

23  can remember what order they were in when they made their

24  appearances.  But that's fine with --

25          THE COURT:  Well, I wrote it --

1          MR. CAVALIERE:  -- I think, everyone.

2          THE COURT:  -- I wrote it -- I wrote it down, so I'll

3    just call on people.

4          MR. CAVALIERE:  Okay.  Fantastic, Your Honor.  Thank

5    you.

6          THE COURT:  All right, Mr. Pitta?

7          MR. PITTA:  Good morning, Your Honor.  Thomas Pitta of

8    Emmet, Marvin & Martin, on behalf of Sagi Genger and TPR

9    Investments.

10          THE COURT:  I'm sorry I mispronounced your name.  I

11    apologize.

12          MR. PITTA:  I'm sorry.  It's Thomas Pitta, P-I-T-T-A.

13          THE COURT:  Yeah.  Sorry about that.

14          MR. PITTA:  Okay.  That's fine.

15          THE COURT:  Go ahead.

16          MR. PITTA:  So, Your Honor, we do wish to proceed with

17    our motion to dismiss at this point.  And there's a few things

18    that I want to just point out that I think are just kind of

19    misunderstandings or just wrong.  The trustee's counsel talked

20    about fifteen years of litigation.  And while there has been

21    fifteen years of litigation here, that's not really what's

22    relevant here at this point.

23          This case was filed in the summer of last year, on the

24    eve of the parties who are the transferees of the debtor's

25    assets, having to respond to the turnover motion that we'd

 1   filed in the district court before Judge Broderick.  And that's
 2   really the only litigation that matters here, because that
 3   litigation decides what happens to the thirty-two million
 4   dollars that we believe came into Orly Genger's estate when the
 5   2013 settlement happened and that were fraudulently transferred
 6   out of her estate.  And if we're right about that litigation
 7   and Judge Broderick decides that some or all of that thirty-two
 8   million dollars should come back into this estate, then we
 9   clearly don't need a bankruptcy.  This debtor has enough
10   resources to pay all of her creditors, legitimate or otherwise.
11          And so that litigation really decides just about
12   everything that needs to be decided here.  And so the reason we
13   believe that the motion to dismiss is appropriate is because it
14   allows us to go back to Judge Broderick and have that case
15   decided and allow this to actually finally come to a
16   conclusion.
17          And so we believe that a motion to dismiss is the
18   appropriate thing here.  And we brought the motion to dismiss
19   in the Austin court, together with the motion to transfer
20   venue, prior to the trustee in Austin entering into any
21   settlement with the debtor and her father and the Brosers and
22   whatnot.  And we brought it because we believed before that
23   settlement was reached, and we believed before this case was
24   transferred to the Southern District, that the most efficient
25   method of bringing this saga to a conclusion is to allow Judge

1  Broderick to decide the turnover motion that was pending before

2  her (sic) before this bankruptcy case was filed.

3          And what we want to point out to Your Honor is that

4  this case was filed -- unlike almost any bankruptcy case I've

5  seen in my twenty years, this case was filed in order to

6  prevent the recapture, by the debtor's estate, of assets.  What

7  was pending before Judge Broderick and what brought about this

8  bankruptcy case was an action to recover thirty-two million

9  dollars plus interest and whatever else, of assets that we

10 believe properly belong to Orly Genger.

11         And this bankruptcy was brought not because of any

12 collection efforts by anybody, or anything along those lines.

13 This bankruptcy case was brought to prevent the -- to prevent

14 Judge Broderick from eventually having to decide whether this

15 debtor could get back thirty-two million dollars of assets that

16 were transferred out of her estate.  And so what we believe is

17 that that is the appropriate litigation to continue.

18         And we appreciate the work the trustee has done here,

19 and we dug in along with the trustee and we made a proposal to

20 the trustee that would have kind of resolved many of the issues

21 in this case, days after the trustee was appointed.  And we've

22 never received a response to that proposal.  But we have worked

23 with the trustee extensively.  We provided a number of memos

24 that provided the trustee with information about the background

25 of this case and certain parties' claims and defenses, in hopes

1  of trying to enable the trustee to get to a settlement.  But
2  frankly, we did that with a very skeptical mind, because these
3  parties have been litigating for a long time, they have been
4  before retired judges and other mediators a number of times
5  over the years, and have been unable to reach a settlement.
6         I would love to have a settlement here, but we don't
7  believe that it's actually likely to occur.  And if it does
8  occur, it'll potentially look like the settlement that was
9  reached in Austin, Texas, which, from the creditors-of-this-
10  estate's perspective, was an abomination; it was terrible.  And
11  the judge there looked at it and said that -- he described that
12  settlement as sparsely described and mostly platitudes.
13         There was no -- there was nothing to the settlement.
14  It was basically, "Give me a few bucks so I can pay my bills,
15  and we'll all go away."  And Sagi Genger and the other parties
16  that are legitimate creditors of this estate weren't interested
17  in that.  But we don't believe there's a real prospect for a
18  settlement happening here, because it hasn't# over a decade
19  now.
20         And so what we believe is that it's time to put this
21  fraudulent transfer, the turnover-motion action, before Judge
22  Broderick and let her (sic) decide it.  And if we lose, then we
23  lose and we'll go home and we'll be done with this.  But if we
24  win, then this debtor has more than enough assets to pay all of
25  her creditors at least once over, but more than that probably.

1          And so while we laud the trustee's interest in trying

2     to get to a global settlement, we just don't think it's

3     possible.  And we don't want to be just in limbo any longer.

4     This case was filed in July, like Mr. Cavaliere said, last

5     summer, on the eve of the response deadline, which Mr. Genger

6     had adjourned in order to supposedly accommodate lawyers'

7     vacation schedules, and then, right before their response was

8     to be filed, instead this bankruptcy was filed.  And then we

9     were stuck in the Texas bankruptcy court for three months.  We

10    got the venue transferred.  And it's been almost another three

11    months that we've been here, and we believe it's time to allow

12    this litigation to proceed.  We would suggest that a hearing

13    schedule on our motion to dismiss be established.

14         We did serve discovery.  And, Your Honor, I want to

15    make clear, I personally have spoken to Mr. Cavaliere a number

16    of times over the course of these last almost three months, and

17    we had reached out to the parties in the case, who had received

18    subpoenas out of the Texas court, and asked them to clarify

19    that they would accept those Texas subpoenas as valid in the

20    New York court.  And we did that just so that -- to determine

21    whether we would need to serve new subpoenas when the time came

22    here.  Only one of the parties actually responded to that

23    request.  Mr. Oswald was nice enough to agree that his client

24    would do that.  Nobody else responded.

25         And so leading up to this status conference, we did;

1    we served new subpoenas out of New York so that we could come

2    here today and say, "Your Honor, we are prepared to proceed.

3    We have served subpoenas.  We believe a motion to dismiss

4    should proceed."  And we'd like to establish a discovery

5    schedule and a trial schedule with respect to that motion to

6    dismiss.

7           We did that -- we served those subpoenas -- I believe

8    it was on Friday.  We allowed this process -- this hopeful

9    settlement process to play out completely.  And essentially on

10   the eve of this hearing, in order to be able to say we're ready

11   to go, we served subpoenas.  We haven't called anybody to

12   follow up on them, to schedule meet-and-confers.  We're

13   allowing this -- we've allowed this process to take place, but

14   we stand before you today and say it's time to allow our

15   turnover motion to proceed and, to do that, we need for this

16   case to be dismissed, because there's nothing to do in this

17   bankruptcy, other -- and Judge Davis said it in his decision on

18   the turnover motion.  He sent it here because, he said, the

19   most important thing that's going to be done in this bankruptcy

20   case is deciding what happens to the 32.3-million-dollar

21   transfers that were made out of this estate.

22          And so that's what we want; we want the Court to

23   decide what happens to the 32.3 million.  And we think that

24   eleven of the litigations that were referenced by Mr. Cavaliere

25   are sideshows.  A number of them have already been decided, and

1  they're on appeal, but they've been decided in my client's

2  favor.  But if -- to be clear, if the turnover motion is

3  granted, none of it matters.  That's the entire gating issue in

4  this case, and we would like that to proceed.

5           Let me just --

6           We're willing to put kind of all the other stuff off:

7  the objections to discharge, and any of the other -- the

8  litigations that are out there.  We don't need to press forward

9  on those.  We filed them because we had to, for timing -- for

10  statute-of-limitations or other deadline purposes.  We don't

11  need to press forward on a number of litigations while the

12  motion to dismiss is pending.  We can put those off.

13           THE COURT:  All right.

14           MR. PITTA:  So --

15           THE COURT:  Okay.

16           MR. PITTA:  And further, Your Honor, the pending

17  nature of the motion to dismiss does not forestall settlement

18  discussions that may otherwise take place.  We are not

19  interested in form over substance.  We're not -- we don't care

20  that there's a bankruptcy pending.  We would like it to be

21  dismissed, because we think it's the wrong venue.  But if the

22  parties, during the bankruptcy, with the help of the trustee,

23  can enter into a settlement, then we're happy to do that.  And

24  we'll terminate the motion to dismiss and we'll enter into a

25  9019 agreement and do it here.

1          We don't want to stop settlement discussions.  We
2    don't think they'll be fruitful.  But we just think that this
3    case needs to move forward.  And so --
4          THE COURT:  All right.
5          MR. CAVALIERE:  -- that's where we are, Your Honor.
6          THE COURT:  All right, terrific.  Thanks very much.
7          MR. CAVALIERE:  Thank you.
8          THE COURT:  All right, counsel to Arie Genger?  Mr.
9    Oswald or Mr. Moore.
10         MR. OSWALD:  Good morning, Your Honor.  Frank Oswald
11   for Arie Genger.
12         THE COURT:  Okay.
13         MR. OSWALD:  Mr. Genger, as I mentioned, is the
14   debtor's father, Sagi's father.  He is the founder of the
15   company called Trans-Resources, Inc.  The gravamen of this
16   action, going back some twenty years, is the equity interest in
17   that company, which, pursuant to divorce settlement
18   proceedings, Mr. Genger had agreed to fund trusts on behalf of
19   the son and the daughter equally and, from that, with stock in
20   the company.
21         In 2008, there was a transaction with the Trumps,
22   negotiated by Sagi.  And pursuant to that agreement, Your
23   Honor, the Trumps had already paid some 26.7 million dollars
24   for the equity in the Sagi Trust, some 10.3 million dollars for
25   the equity in the Orly Trust, and shares on account of Mr.

 1   Genger's interest, 7.4 million dollars.

 2          Mr. Genger was upset to hear about these transactions.

 3   He pursued claims against the Trumps on account of these

 4   transfers, on account of his claims.  And years later in 2013,

 5   there was a subsequent settlement between -- or among the

 6   Trumps, Arie Genger, Orly in her individual capacity, and the

 7   Brosers.  And the Brosers go back some fifty years with Mr.

 8   Genger and decided to assist in the funding of the litigation

 9   so that Arie Genger can pursue those claims.

10          And you'll hear, I'm sure, later in the proceedings

11   and, I guess, in the summaries that Your Honor has requested in

12   advance of the April conference -- my summary, Your Honor --

13   I'm just involved in (sic) here since the case got transferred

14   to New York, so I have a couple of weeks' lead time ahead of

15   Mr. Cavaliere and the trustee.  But the skinnied-down summary

16   of these litigations and the issues here is probably about

17   twenty-five pages.

18          Nonetheless, I think what you're going to find and

19   what has not been found yet by any court and as Mr. Pitta just

20   said:  the entitlement to the balance of this 32.2 (sic)-

21   million-dollar settlement that the Trumps have not yet paid.

22   And all the parties on this side of the bench recognize that

23   the remaining proceeds had been dwindling because the Trumps

24   had their own counsel, who have been monitoring various

25   proceedings, have to respond to proceedings from time to time.

1   It's certainly in no one's best interest to continue this
2   litigation.
3         But what we have is a scenario where the debtor --
4   term that I've used -- is really collateral damage.  And a
5   father, who is trying to bring closure here to protect the
6   daughter, has funded her expenses to the tune of over five
7   million dollars.  This Court certainly has many times -- had to
8   decide property interests, property rights.  We too have worked
9   with Mr. Cavaliere, Ms. Piazza, since they got appointed.  A
10  number of meetings, turnover of documents.  And they're
11  certainly fully capable of making the business decisions that
12  the trustee's charged to making (sic) on behalf of the estate.
13        I think it's important for the Court to recognize, if
14  you have not had a chance yet to look at the schedules, the
15  nature of these claims, Your Honor.  This is not a debtor that
16  was involved in businesses, run up business debt.  It's all
17  debt -- primarily debt related to this fifteen to twenty years
18  of litigations.  It's really quite a shame, the value
19  destructions.
20        And so we agree with Mr. Cavaliere to allow the
21  trustee to complete her analysis.  As you mentioned, many of
22  the parties have been working on the outline of a settlement
23  that we think will also resolve many of the issues.  And
24  ultimately, it could be put before this Court, who's entitled
25  to the rest of that money.

 1          There's no question, I don't think anybody disputes on

 2     its face, that the debtor individually never had shares in this

 3     company.  We're talking about the shares that were gifted to

 4     the Orly Genger Trust.  But again, these are issues that can be

 5     dealt with.  I think they could be dealt with much more quickly

 6     in front of this Court, as is done on many occasions.  And

 7     we're looking forward to advancing the ball and getting some of

 8     this, if not all of it, resolved, whether consensually or with

 9     most parties, and the Court having to deal with objections.

10          I do think, and based upon my review of the record, a

11     lot of what has been requested in various document requests has

12     already been turned over.  Numerous proceedings.  But again, we

13     can address particular document-and-discovery requests with the

14     parties and with the Court as we get there.  But I think the

15     suggestion of getting summary statements, having a follow-up

16     conference -- I think Mr. Cavaliere says April 7.  Right around

17     the corner.  We'll have a lot more clarity and color for the

18     Court as to how we can try to get this done.  Thank you, Your

19     Honor.

20          THE COURT:  All right.  Thank you very much.

21          Counsel for Orly Gener, Ms. Wolinger (sic) --

22     Willin -- I'm sorry, I'm mispronouncing your name.  I

23     apologize.

24          MS. WLODINGUER:  That's fine, Your Honor.  It's

25     [Vloh'-ding-gur], for the record.

 1          THE COURT:  Thank you.

 2          MS. WLODINGUER:  Yeah.  So, yes, Julia Woldinguer on

 3   behalf of the debtor.

 4          Unlike Sagi Genger and TPR, we care very much about

 5   this bankruptcy proceeding.  As Mr. Pitta (sic) just told the

 6   Court, we feel the debtor had been collateral damage in the

 7   disputes and family litigations over the past fifteen, twenty

 8   years.  The fact of the matter is, at the end of the day,

 9   debtor's liabilities far outweigh her assets.  She's an artist.

10   She does largescale public-art installations.  She's a mother.

11   Her family has been embroiled in this very contentious

12   litigation for many, many years.  And as Mr. Pitta said, she's

13   collateral damage, essentially.

14          We disagree that a motion to dismiss should be

15   allowed.  A Texas judge, Judge Davis, I believe it was -- in

16   proceedings on October 23rd, he basically said that a motion to

17   dismiss could be a, quote-unquote, "nonstarter".  And he

18   acknowledged that debtor's claims belonged in bankruptcy

19   somewhere.  Sagi and other parties aligned with him

20   acknowledged that the Southern District of New York was such a

21   venue.  Yeah, and we agree that the case should be heard in New

22   York, right here before you.

23          On the merits, the motion to dismiss is replete with

24   factual misstatements.  Debtor never received the money under

25   the Trump settlement agreement; she never had a right to it.

1   And everyone involved in that transaction has already testified

2   to that in other proceedings.  She does not have any

3   entitlement to the notes that were issued in connection with

4   that settlement agreement.

5        We believe that a dismissal motion would be futile, if

6   not frivolous.  It's definitely a waste of resources before

7   this Court.  There's a limited corpus of the estate.  And I

8   don't think we should be tied up in discovery motions and

9   motions to dismiss, when there's such a limited estate.

10       The subpoena served by Sagi Genger was served on

11  Monday.  I believe prior counsel indicated that there were nine

12  served on the same day, which was Monday, I believe.  With

13  respect to the subpoena that was served upon Orly, there are

14  forty-two discrete document requests, and it called for

15  production by March 16th; less than two weeks.

16       All of the discovery in the world that could have been

17  taken between and among these parties has already been taken.

18  This is just an example of the vexatious discovery and

19  litigation tactics that are going to be employed if a motion to

20  dismiss goes forward.  To that end, we disagree that it should

21  go forward.  We agree with Mr. Cavaliere's recommendation to

22  the Court to put this over to allow the trustee additional time

23  to investigate the claim.  We would also ask that the Court put

24  off the adversary proceedings and discharge action until a

25  further time, stay it in the interim, until we can agree how to

1   move forward.

2            THE COURT:  All right.  Thank you very much.

3            All right.  Counsel for the Orly Genger Trust; Mr.

4   Pollack or your colleague?

5            MR. POLLOCK:  Good morning, Your Honor.  Adam Pollock

6   for the Orly Genger Trust.  And thank you for your time -- for

7   Your Honor's time and consideration this morning.

8            As Mr. Cavaliere mentioned, we are proceeding -- or

9   have been proceeding in the district court in the case

10  captioned "Manhattan Safety" against nondebtor parties.

11  Basically, as counsel standing here before me have mentioned,

12  really the main asset that we are talking about is thirty-two

13  million dollars of funds stemming from a 2013 settlement, which

14  is the property, we contend, of the Orly Genger Trust and, as

15  Mr. Oswald said, and we concur, not property of the bankruptcy

16  estate.  These were -- this settlement relates to shares which

17  were the Orly Genger Trust shares and were shares that were

18  never owned or held by debtor individually.

19           So this is not money of the bankruptcy estate that we

20  are litigating about in that matter.  The defendants in that

21  matter, in the district-court matter, have taken the position

22  that the prosecution of the claims in the district court

23  interferes with the bankruptcy estate.  For the reasons I just

24  mentioned, we disagree.  This is non-bankruptcy-estate money,

25  we contend, and these are nondebtor parties.

1          So we can't agree to continual -- there's kind of an

2    informal stay there.  We can't consent to continuing that stay

3    after March 31st, because of the reasons I just mentioned.

4          A couple more short points.  We don't want to litigate

5    for five or ten more years as Mr. Cavaliere mentioned, that

6    maybe -- I think maybe skeptically he mentioned.  We certainly

7    do not.  We hope to get a resolution.  We could do the

8    resolution here -- we could achieve a resolution -- or in the

9    district court.  I'm not concerned about where we write it, but

10   I am concerned that we move forward.

11         Briefly, a couple other points that have been

12   mentioned.  There's also the action that he mentioned, against

13   the law firm.  Again, nondebtor parties and nondebtor monies.

14   We can address that separately.  But we disagree with his

15   points and we'll follow up.

16         Finally, on the motion to dismiss, we have no position

17   on the motion to dismiss, as long as we can move forward with

18   our actions against the nondebtor parties.  But this whole

19   bankruptcy -- it's hard to understand what we're doing here.

20   It doesn't make sense to me.  And for that reason, the motion

21   to dismiss does make sense to me if this bankruptcy continues

22   to impede our ability to proceed against the nondebtor parties

23   in the district court.

24         I think that's all the --

25         THE COURT:  Okay.  All right, could I just add to --

1   Mr. Pollock, would you consider extending your agreement to

2   stand down on the Manhattan Safety litigation?  Would you

3   consider extending that to April the 7th?

4           MR. POLLOCK:  From March 31st through -- to April 7th?

5           THE COURT:  Yes.

6           MR. POLLOCK:  Sure.

7           THE COURT:  All right, great.  Thank you.

8           MR. POLLOCK:  But only to April 7th.

9           THE COURT:  I understand.

10          All right.  Counsel for Dalia Genger; Mr. Tokayer.

11          MR. TOKAYER:  Yes.  Ira Tokayer.  Good morning, Your

12  Honor.  I join all counsel in thanking you for the attention

13  you've given to this case this morning.

14          I concur with your suggestion that parties should be

15  given some time.  Adjourn this conference to submit materials

16  that can give you the full flavor of what's going on here.

17  Briefly, Your Honor, however, we did file an adversary

18  proceeding because of the potential deadline.  We did not serve

19  those papers yet.  We were waiting for this conference and for

20  potential settlement discussions with the trustee's counsel.

21          I can hold that action, and would be happy to hold

22  that action, in abeyance, pending the motion to dismiss, which

23  I have joined.  I believe that the pendency of the bankruptcy

24  and the dismissal motion is -- it's a threshold matter that

25  Your Honor should address first and foremost.  If the

1   bankruptcy proceeds, then we'll be happy to proceed with the

2   adversary proceeding promptly.

3          But Mrs. Genger is satisfied that she could pursue her

4   claims in the action before Judge Broderick and obtain full

5   relief in that action.  She's a plaintiff in that action.  The

6   monies that are being fought over in that action, in our view,

7   are not part of the bankruptcy estate.  And frankly, it's just

8   this bankruptcy that has delayed Ms. Genger from being able to

9   obtain the relief to which she's entitled, before Justice

10  Broderick.

11         As far as the adjournment, however, I need to bring up

12  just a housekeeping matter.  Assuming that the world is the

13  same then as it is now, I have plans to be out of the country

14  on April 7th --

15         THE COURT:  Well, okay.

16         MR. TOKAYER:  -- for the holiday.

17         THE COURT:  Oh, okay.

18         MR. TOKAYER:  So --

19         THE COURT:  All right.  We can --

20         MR. TOKAYER:  But perhaps I could --

21         THE COURT:  We can --

22         MR. TOKAYER:  I could make it earlier or later.  And

23  I'm happy to discuss another date with counsel, or now.

24         THE COURT:  Yeah, well, why don't you discuss it with

25  counsel, and in particular with Mr. Pollock.

1          MR. TOKAYER:  I'd be happy to, Your Honor.

2          THE COURT:  Terrific.  Thanks very much.

3          MR. TOKAYER:  Again, thank you for your attention.

4          THE COURT:  All right.  Sure.  Thank you.

5          Mr. Gart -- is it Gartman?  Do you wish to be heard?

6          MR. GARTMAN:  Yes, Your Honor.  Chris Gartman from

7     Hughes Hubbard & Reed, on behalf of ADBG, LLC.  That's the

8     litigation fund everybody's been talking about.  And, Your

9     Honor --

10         THE COURT:  Yes.

11         MR. GARTMAN:  -- David and Arnold Broser -- you've

12    heard the Broser name thrown around a lot here -- they are

13    businesspeople who are members of the entity, ADBG, LLC.

14         So as you've heard --

15         THE COURT:  Thank you.

16         MR. GARTMAN:  -- a little bit about, ADBG funded the

17    litigation that was ultimately settled with The Trump Group,

18    provided -- and is owed over twenty million dollars --

19    obviously, you would have to subtract the amount that they've

20    received already, but funded well in excess of twenty million

21    dollars.  We're talking very expensive lawyers; Davis Polk and

22    Paul Weiss were involved.  And as you heard, Skadden was on the

23    other side.  This was years of litigation.  And the settlement

24    that everybody's talking about, this Trump Group settlement,

25    would not have been possible had it not been funded -- the

1   litigation had not been funded by ADBG.

2           The settlement that you've heard about -- you've heard

3   a lot about 32.3 million dollars.  The settlement itself was

4   for fifty million dollars.  Okay.  What you haven't heard is

5   that there is a share of that settlement -- and you heard Mr.

6   Oswald talk about it -- in excess of ten million dollars,

7   relating to the Orly Trust shares, and approximately seven

8   million dollars allocated to Arie Genger shares that Sagi

9   Genger, on behalf of TPR, which was a family holding company,

10  previously had sold those shares to The Trump Group in addition

11  to his share, which was twenty-seven million dollars.  So he

12  had previously sold forty-four million dollars.  As part of

13  that settlement, the 10. -- whatever it was, 10.7 and 7.4, are

14  included in that settlement.  That money ultimately went to

15  TPR.

16          So when we talk about the 32.3 million dollars, we're

17  talking about money that would not have been possible had it

18  not been for the efforts of Arie Genger to continue to litigate

19  his interests in the Trump -- in this Trans Resources, Inc.,

20  referred to as "TRI", against The Trump Group.

21          The settlement came shortly after an appeal had been

22  filed by Arie Genger, relating to the very amounts that were in

23  dispute regarding the settlement.  What you haven't heard is

24  that the shares resulted from a divorce between Arie Genger and

25  Dalia Genger.  And as part of what Arie Genger intended as a

1     distribution of the wealth of that family company, the company

2     that he built, that part of it would go to a trust established

3     for his daughter, part of it would go to a trust established

4     for his son, he would get a part of it, and his wife's

5     consideration was the interest in the family -- a majority

6     interest in the family holding company.

7              What has happened since then, Your Honor, is that Sagi

8     Genger has used the position that he obtained from Dalia

9     Genger, in the family holding company, to try to steal the

10    entirety of the family wealth and shield it from everybody

11    else.  And I don't use that word lightly, Your Honor.  And so

12    what we have here is years of litigation that have been created

13    by Sagi Genger, to create what Judge Strine in Delaware said

14    was an attempt to collect on a Powerball ticket, to take all

15    the family wealth.  I added that last part, Your Honor.  But

16    Judge Strine recognized that what was really happening here is

17    that Sagi and Dalia Genger were trying to take what was

18    supposed to be an equal distribution of the family wealth, and

19    result in Sagi and Dalia having all the money, and Orly getting

20    nothing.

21             And this is a court of equity.  We say it is just

22    simply not equitable.  Judge Strine recognized that also.  And

23    shortly after that hearing in which Judge Strine recognized

24    that -- stated that Sagi Genger was trying to collect on a

25    Powerball ticket, not surprisingly, Dalia Genger dismissed that

1    litigation with prejudice.  That was regarding the Orly Trust

2    shares, and it was against The Trump Group.  That was shortly

3    after the July 2013 -- the June 2013 settlement.

4          What you also haven't heard, Your Honor, is that in

5    June 2012, long prior to the Sagi/Genger lawsuit against Orly

6    Genger, a year prior to The Trump Group settlement, Orly Genger

7    and Arie Genger created a trust called The Genger Litigation

8    Trust.  And they assigned to that trust all proceeds of what

9    I'll just broadly refer to as "the litigation".  And what I

10   mean by that, Your Honor, is the litigation that was funded by

11   ADBG.  And if proceeds of that litigation came in the door,

12   they were assigned to The Genger Litigation Trust and, pursuant

13   to that document, were to be distributed to ADBG until such

14   time as ADBG was, obviously, paid.

15         So what we have now is we have an attempt to collect

16   the amount that has been paid, 17.3 million dollars, to Arie

17   Genger, which Arie then used to pay for the litigation funding,

18   in part.  My client is still owed a lot of money.  You've heard

19   4.5 million dollars.  It's actually more than that.  Obviously,

20   the meter is still running; I'm here today.  But we have an

21   issue where there's a continuing amount, there's interest,

22   right, there's continuing legal fees.  And any amounts that are

23   recovered pursuant to that Genger Litigation Trust agreement --

24   it is our position that such amounts are to be used to pay the

25   litigation funder, ADBG.

1       So starting in June, shortly before this bankruptcy

2   was filed, Sagi Genger and Dalia Genger sought to bring in new

3   claims to recover the proceeds of the settlement that had been

4   transferred so far and to recover amounts on those two 7.5-

5   million-dollar notes that are in escrow that have not been

6   transferred so far.  And they engaged in really outrageous

7   litigation tactics in doing so.

8       You've heard about the Broderick action, which is a

9   turnover motion brought by Sagi, claiming that the settlement

10  proceeds belong to Orly Genger.  You also heard about the

11  Manhattan Safety action, in which Dalia and entities that had

12  been created by Dalia and Sagi are taking the position that one

13  hundred percent of the settlement proceeds belong to the Orly

14  Trust.

15      In both instances, they're trying to obtain a hundred

16  percent of those settlement proceeds, and they have an

17  intercreditor agreement that they have created, in which they

18  share the proceed no matter who wins.  So they're trying to

19  spread their chips around the table and pursue the same claim

20  in multiple courts, using multiple newly created entities, one

21  of which is a hundred-percent owned by the Orly Trust, so that

22  they can try to get whatever they can get from wherever they

23  can get it.  And in doing so, they've continued to harass Orly

24  Genger; and frankly, the only reason that Orly Genger has had

25  to file for bankruptcy.  And it's a sad situation, but it is

 1    what it is.  And at some point these issues will need to be

 2    addressed.

 3           These issues were thoroughly investigated by the

 4    trustee in Texas.  These issues are being thoroughly

 5    investigated by the successor trustee here today.  Our clients

 6    and us have been very open with both trustees.  We have nothing

 7    to hide here.  We have provided information and believe that

 8    the trustee here will come to the same conclusion that the

 9    trustee in Texas came to, which is that these claims are

10    meritless and will be very difficult to prove.

11           Thank you, Your Honor.

12           THE COURT:  Thank you.

13           All right, then, Mr. Herschmann, do you wish to be

14    heard?

15           MR. HERSCHMANN:  Your Honor, Eric Herschman.  Just for

16    two seconds, really.

17           I think that --

18           THE COURT:  Thank you.

19           MR. HERSCHMANN:  I think that the most prudent thing

20    for the Court to do would allow the parties to see whether we

21    can come to resolution and whether Orly can move on with her

22    life.  Thank you.

23           THE COURT:  Thank you.

24           MR. PITTA:  Your Honor --

25           THE COURT:  Okay.  Then what --

 1          MR. PITTA:  Your Honor, it's Thomas Pitta.

 2          THE COURT:  Yeah.

 3          MR. PITTA:  I would just ask for one minute for my

 4   partner, Mr. Dellaportas, to respond to some of the statements

 5   made by --

 6          THE COURT:  Sure.

 7          MR. PITTA:  -- Mr. Gartman.

 8          THE COURT:  All right.  That's fine.

 9          MR. DELLAPORTAS:  So -- thank you, Your Honor.  I'll

10   be very brief.

11          One of the reasons these litigations have gone on for

12   fifteen years is, when -- even when certain -- when judges have

13   decided things, they tend to be relitigated by certain of the

14   parties.  And when I was listening to Mr. Gartman, virtually

15   everything he said is contradicted by final adjudicated rulings

16   of various courts.

17          In particular, with regard to the thirty-two million,

18   District Judge Forrest twice ruled that that money was

19   attributable solely to Orly having, quote, "monetized her

20   beneficial interest in the TRI shares".  Both of those rulings

21   were then appealed by Orly and unanimously affirmed by separate

22   panels of the Second Circuit.

23          With regard to an earlier allegation that my client

24   somehow had stolen money, he's referring to an action in which

25   District Judge Keenan found that certain other proceeds not at

 1   issue in this case were properly awarded to TPR Investment

 2   Associates.

 3          So a lot of what we're hearing are things -- and it's

 4   one of the reasons we wanted the motion to dismiss, is we feel

 5   we can very carefully lay out the relevant rulings of the prior

 6   federal courts and, to a certain extent, the appellate division

 7   of the state court.  And really, everything of consequence has

 8   already been adjudicated, and what we simply need at this point

 9   is an implementation of that through the appropriate turnover

10   proceeding.  Thank you.

11          THE COURT:  Okay, thank you.

12          Anyone else wish to be heard?

13          Okay, here's how --

14          MR. CAVALIERE:  Your Honor?

15          THE COURT:  -- I'd like to --

16          MR. CAVALIERE:  I'm sorry.

17          THE COURT:  Oh, yes.

18          MR. CAVALIERE:  Rocco Cavaliere, Tarter Krinsky.  If I

19   could just --

20          THE COURT:  No problem.

21          MR. CAVALIERE:  -- be heard briefly, Your Honor?

22          THE COURT:  Yes.  Of course.

23          MR. CAVALIERE:  Just in response to Mr. Pitta from

24   earlier; yeah, there is this theory that this case gets

25   dismissed and they go back to Judge Broderick, that they now

1    have obviously control of the litigation; Judge Broderick is

2    just simply going to grant this turnover motion.  Maybe.  But

3    they don't have a crystal ball as to what the ultimate merits

4    will be.  Obviously, it's thirty-two million dollars at stake.

5    In my experience, usually doesn't get decided in a month or

6    two, on a turnover motion.

7              And so when Mr. Pitta speaks about his -- the

8    likelihood of success or all that needs to be done is dismiss

9    the case, the turnover motion, we're going to win, the trustee,

10   as an independent fiduciary, doesn't just go for broke.  That's

11   why we have a system, Your Honor.  We have an ability for an

12   individual that is not partial, that can make appropriate

13   judgments and assess the risks of litigation, the costs of

14   litigation, and obtain a potential settlement that may not be

15   thirty-two million, Your Honor.  There may be a discount off

16   that; no question.  And then we have an obligation to present

17   that to the Court for approval, and all rights are preserved

18   because creditors can file objections if they can demonstrate

19   that the settlement is unreasonable.

20             With respect to just the public policy concerning a

21   bankruptcy case, this is actually a perfect example of a case

22   that's absolutely warranted and needed.  You have one forum

23   that can address and finally conclude massive litigation over a

24   course of many years.  You have a debtor that at least is

25   entitled to a presumption of getting a fresh start and being

1   able to get a discharge.  And again, there again, parties have

2   a right to object to the discharge, which they have.  And they

3   could certainly press it.  But hopefully that doesn't happen

4   and she can maybe move on with her life.

5          So there's a lot of policy reasons, the automatic

6   stay, why this case should remain.  I think Your Honor stated

7   earlier that Your Honor's not going to decide those issues and

8   schedule the hearing now.  I think Your Honor's suggestion of

9   letters, status updates, from each party, two weeks before the

10  hearing, whenever that is -- assumably (sic) April 7th.  If

11  we're moving it, so be it.  But we'll each provide our views

12  and, by then, hopefully we've reached a settlement that we can

13  outline for the Court; if not, we'll let the Court know where

14  we are.

15         And then also with respect to the status update on the

16  charts for the litigations, we will work with the other parties

17  as to what the current status is.  If for some reason parties

18  have a dispute as to -- about the pendency of any of those

19  actions and what took place and the rulings and so forth, we'll

20  state that in the chart, as to the parties' views of what the

21  current status is, because I think there's some --

22         THE COURT:  All right.

23         MR. CAVALIERE:  -- disputes about whether certain

24  things -- around certain findings and so forth.  And I just

25  envision that that could potentially be a problem.  I don't

1    want to hang that up.

2           So with that said, Your Honor, I just -- one

3    mechanical question with respect to the charts of the

4    litigation and with respect to the status updates.  Should I

5    assume that you want those electronically filed, or would you

6    prefer that we submit them to chambers without filing on the

7    court docket?

8           THE COURT:  No, I'd like it all to be electronically

9    filed.  But just one thing.  I think Mr. -- again, it's Mr.

10   Pitta.  I think he did say that, if he lost, so be it, I think

11   were his words, but that he thought Orly had enough money to

12   pay, at least one time, all of the -- all of her creditors.

13   But that being said --

14          MR. CAVALIERE:  Your Honor, if I may just jump in.

15   There are other creditors here.  It's -- Kasowitz is a

16   creditor, Zeichner Ellman's a creditor --

17          THE COURT:  Excuse me.  Mr. --

18          MR. CAVALIERE:  -- Mr. Herschmann's a creditor.  So --

19          THE COURT:  Mr. Cavaliere --

20          MR. CAVALIERE:  -- it's not -- we try to preserve --

21          THE COURT:  Mr. Cavaliere, hold it.

22          MR. CAVALIERE:  -- some money for everyone.

23          THE COURT:  Yes.  I don't want to argue about it.  I'm

24   just trying to -- and maybe it was silly of me to think that I

25   should take a moment to try to correct what I thought was just

1  a mistake that you were making as it related to what was in the

2  record.  A lot was said.  I probably should have just left it

3  alone.

4       So to answer your question, what I would like is for

5  all of the documents that we've been talking about be filed of

6  record.  And I very much appreciate your willingness to take

7  the lead on trying to put together the summary of the various

8  actions and where things stand.  I think that would be very

9  helpful.

10       What I would add is that you folks confirm on (sic)

11  yourselves -- I know Mr. Tokayer has an issue timingwise, and

12  we'll try to work through that.

13       Mr. Pollock, I can't force you to stand down.  At

14  least as things now stand, I can't do that.  I would ask and I

15  hope that you would be able to do that.  I know we talked about

16  the 7th.  I don't know, given the timing for Mr. Tokayer,

17  whether -- what impact, if any, that's going to have on the --

18  on our getting together again.

19       So I don't want to be in the situation where we have

20  some people who can't come and then we move forward without

21  them.  But I'm going to leave all of that to you folks.  And

22  you'll please get back to Ms. Rodriguez and give her just a

23  proposal as to dates that work for the group.  And then I would

24  like, as I'd indicated, two weeks before that time.  And if it

25  goes out -- if we go beyond April the 7th, I'd like three

1    weeks, if you could, but two weeks I can probably live with,

2    just to go -- so that I have, again, the summary from the

3    parties as to where things stand and your views on these

4    things, so that, when we get together the next time we do, we

5    can talk about scheduling and how to proceed with the various

6    actions.  Does that work for everyone?

7              MR. POLLOCK:  Very good.  Thank you, Your Honor.  And

8    for the record, Adam Pollock.

9              THE COURT:  All right.

10             MR. POLLOCK:  That's fine, Your Honor.  Thank you.

11             THE COURT:  Terrific.

12             MR. PITTA:  Your Honor, it's Thomas Pitta.  If I could

13   raise one, just, housekeeping matter in addition.  We had

14   circulated --

15             THE COURT:  Yes --

16             MR. PITTA:  -- to various parties, and various parties

17   have actually previously agreed to, a confidentiality

18   stipulation.  We had circulated to the -- I believe, the

19   remaining parties.  And we think it's important to get that

20   done.  Hopefully we can agree, amongst all the parties, to that

21   and then have that submitted to the Court for entry as a

22   confidentiality order in the case.  And so I would hope --

23             THE COURT:  Okay.

24             MR. PITTA:  Go ahead, Your Honor.

25             THE COURT:  All right.  All right, we have just -- you

1   know, we have chambers rules as it relates to that.  So just

2   take a look at that.  But that sounds fine --

3           MR. PITTA:  Thank you, Your Honor.

4           THE COURT:  -- as far as getting that taken care of.

5           All right, is there anything else we need to chat

6   about today?

7           MR. HERSCHMANN:  Yes, Your Honor.  It's Eric

8   Herschmann.  I just want to raise one issue on the --

9           THE COURT:  Yeah.

10          MR. HERSCHMANN:  -- on the confidentiality order,

11  which I didn't think --

12          THE COURT:  Yes, sir.

13          MR. HERSCHMANN:  -- was going to come up today.  And

14  I'd asked counsel, Mr. Pitta or Mr. Dellaportas, or even Sagi

15  Genger, who's in the courtroom here today, to address this

16  point.  They accused me of bankruptcy fraud and intimidating a

17  witness in a filing in Texas.  We filed an opposition that

18  showed Orly did not have an account in Israel, contrary to the

19  representations that they made.

20          I went to Israel.  I hired counsel there to

21  investigate it, to confirm it.  We turned over the information

22  to the prior trustee.  The investigator, who Sagi Genger hired,

23  illegally, under Israeli law, obtained travel records for Orly,

24  and her old bank history, bank record, from sixteen or so years

25  ago.  He likewise admitted that he illegally obtained my

1   information and my travel records and that a report was

2   provided to Sagi Genger and, I believe, Mr. Dellaportas.

3            So before we get into discussion of a protective order

4   of confidentiality agreements, I would like to know and ask an

5   inquiry, what information have they illegally obtained from me.

6   There is an ongoing criminal investigation in Israel because of

7   it.  And there's been other issues where, pursuant to Justice

8   Freeman's protective order, certain of my information has been

9   provided in violation of that order.

10           So before we get into a potential confidentiality

11   agreement, I would at least like to understand violations that

12   have occurred, and then I can work in what potential remedies

13   or cures would need to be done.  But I'd ask for they (sic) at

14   least to produce to either this court or me the information

15   that they've obtained about my financial records.

16           THE COURT:  All right.

17           MR. DELLAPORTAS:  So, very briefly, Your Honor.  We're

18   not aware of any --

19           THE COURT:  Yes.

20           MR. DELLAPORTAS:  Oh, this is John Dellaportas.

21           THE COURT:  I'm sorry --

22           MR. DELLAPORTAS:  We're not aware of any illegality.

23   There was an issue with regard to the transfer, where the

24   debtor claimed she lived in Austin and only Austin.  And

25   therefore, an Israeli investigator was hired and found out that

1    the debtor had in fact spent much of her time in Israel,

2    contrary to representations she made to the Court.  That report

3    was provided in full to Mr. Herschmann.  We have nothing

4    further beyond what we've provided.  He's had it for I don't

5    know how many months.  He apparently then went to our

6    investigator and frightened him in some fashion, threatened to

7    sue him, and so forth.

8           So that's a whole issue for another day, which we'd be

9    happy to address.

10          MR. HERSCHMANN:  Your Honor, it's Eric Herschmann.  If

11   I could just address that.  And maybe we can get Mr.

12   Dellaportas to answer the question specifically, because I have

13   no doubt it'll be relevant in various jurisdictions:  did they

14   obtain --

15          THE COURT:  I'm sorry, Mr. Herschmann.  Mr.

16   Herschmann, I'm sorry to interrupt you.

17          MR. HERSCHMANN:  Sure.

18          THE COURT:  I understand the problem.

19          MR. HERSCHMANN:  Okay.

20          THE COURT:  And it's -- you can understand my -- from

21   your perspective, it's quite serious.  I don't want to try to

22   do this on this -- at this hearing right now today.  You raise

23   a very good point as to the issues around the confidentiality

24   agreement.  And your point is -- I think you're saying -- or

25   you'll correct me if I'm wrong, please -- that you're not

1   prepared to talk about that, until you understand what it is

2   they've got.  Is that fair?

3          MR. HERSCHMANN:  That's exactly right, Your Honor; and

4   if they violated the prior orders.

5          THE COURT:  Right.  Okay.  And so the way I think we

6   should do this, at least in the interim, is you can move

7   forward in that; you can have your discussions.  Mr.

8   Herschmann, you would please include, in anything that you

9   submit, and, Mr. Pitta and Mr. Dellaportas, you would as well,

10  to address those issues, if in fact they are issues, once you

11  guys have had an opportunity to look at them -- and hopefully

12  you'll be able to resolve it.

13         But I understand that, as we're moving forward, at

14  least, Mr. Herschmann, from your perspective, that's something

15  that's a gating issue for you.

16         MR. HERSCHMANN:  That's exactly correct, Your Honor.

17         THE COURT:  Okay.  All right, so that's how we'll

18  proceed.  And again, please get in touch with Ms. Rodriguez.

19         And, Mr. Cavaliere, thanks very much for taking time

20  to walk me through all of the various actions and the steps and

21  all of that.  I appreciate it.  I appreciate very much all of

22  you taking time today to be in court to be able to chat with me

23  about all of this stuff.  I'm hopeful that you'll be able to

24  work through towards a resolution.  And you'll see where things

25  stand when we next get together.

1          So I think we're all set.  And again, thank you all

2    very, very much.

3          MR. CAVALIERE:  Thank you very much, Your Honor.  Feel

4    better.

5          IN UNISON:  Thank you, Your Honor.

6          THE COURT:  Thanks very much.  Bye-bye.

7       (Whereupon these proceedings were concluded at 1:51 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7

8

9

10

11       _____

12       Clara Rubin

13

14       eScribers

15       352 Seventh Ave., Suite #604

16       New York, NY 10001

17

18       Date:  March 9, 2020

19

20

21

22

23

24

25

**[**

[Vloh'-ding-gur] (1)
51:25

**A**

**ABDG (2)**
24:2;27:5
**abetting (1)**
28:7
**abeyance (1)**
56:22
**ability (3)**
34:23;55:22;66:11
**able (11)**
11:4,9;14:3;33:14;
46:10;57:8;67:1;
69:15;74:12,22,23
**abomination (1)**
44:10
**A-B-O-U-L-A (1)**
9:20
**ABOULAFIA (5)**
9:15,17,17,20,22
**Absolutely (3)**
17:18;29:25;66:22
**accept (1)**
45:19
**accepted (1)**
38:15
**accommodate (1)**
45:6
**accomplish (1)**
12:10
**account (4)**
48:25;49:3,4;
71:18
**accused (1)**
71:16
**achieve (2)**
30:9;55:8
**acknowledged (2)**
52:18,20
**action (29)**
20:14;21:20;24:2,
7;25:16;26:17,19,25;
27:2,18,19;28:2,6,8,
16;43:8;44:21;
48:16;53:24;55:12;
56:21,22;57:4,5,5,6;
62:8,11;64:24
**actions (26)**
16:22;19:6,11,13,
23,25;20:1,7,9;
25:15,16;27:16,17,
19;29:19,21,23;35:3;
37:24;39:18;40:17;
55:18;67:19;69:8;
70:6;74:20
**actual (1)**
39:17

**actually (10)**
7:16;14:6;19:13;
37:17;42:15;44:7;
45:22;61:19;66:21;
70:17
**ADAM (5)**
5:17;9:12;17:19;
54:5;70:8
**ADBG (14)**
4:13;10:16,17;
20:19;26:18;33:22;
58:7,13,16;59:1;
61:11,13,14,25
**add (2)**
55:25;69:10
**added (1)**
60:15
**addition (6)**
15:17;35:11;36:7;
37:2;59:10;70:13
**additional (1)**
53:22
**address (10)**
18:12;40:17;
51:13;55:14;56:25;
66:23;71:15;73:9,
11;74:10
**addressed (3)**
22:5;29:11;63:2
**addresses (1)**
15:18
**adjourn (3)**
40:7,8;56:15
**adjourned (1)**
45:6
**adjournment (1)**
57:11
**adjudicated (2)**
64:15;65:8
**administer (1)**
31:2
**administration (3)**
21:5;32:6;39:21
**admitted (1)**
71:25
**adult (1)**
35:13
**advance (1)**
49:12
**advancing (1)**
51:7
**adversary (4)**
21:24;53:24;
56:17;57:2
**affiliated (1)**
15:21
**affirmative (1)**
22:12
**affirmed (2)**
25:20;64:21
**again (17)**
7:21;10:2;11:3;
21:25;30:3,21;51:4,

**12;55:13;58:3;67:1,
1;68:9;69:18;70:2;
74:18;75:1**
**against (23)**
15:13,15,18;
20:15;22:12,13,14;
24:6;26:18;27:4;
28:8,17;33:18;35:3;
36:23;49:3;54:10;
55:12,18,22;59:20;
61:2,5
**ago (1)**
71:25
**agree (9)**
20:8;34:8;45:23;
50:20;52:21;53:21,
23;55:1;70:20
**agreed (9)**
24:13,13;34:12;
36:5,6,10,21;48:18;
70:17
**agreement (18)**
25:24;26:4,6;34:2,
17,22;36:8,17,18;
47:25;48:22;52:25;
53:4;56:1;61:23;
62:17;72:11;73:24
**agreements (2)**
34:21;72:4
**agrees (1)**
39:1
**ahead (6)**
12:21;31:6;40:9;
41:15;49:14;70:24
**aiding (1)**
28:7
**aligned (1)**
52:19
**allegation (1)**
64:23
**allegations (1)**
25:4
**alleged (5)**
23:6;24:4,11,17;
28:23
**allegedly (1)**
24:19
**allocated (1)**
59:8
**allow (11)**
21:4;37:24;38:1;
39:10;42:15,25;
45:11;46:14;50:20;
53:22;63:20
**allowed (3)**
46:8,13;52:15
**allowing (2)**
26:5;46:13
**allows (2)**
39:22;42:14
**almost (3)**
43:4;45:10,16
**alone (1)**

**69:3**
**along (3)**
40:19;43:12,19
**alternative (3)**
38:14,16,16
**although (1)**
23:12
**amended (1)**
28:18
**among (2)**
49:5;53:17
**amongst (1)**
70:20
**amount (3)**
58:19;61:16,21
**amounts (5)**
26:10;59:22;
61:22,24;62:4
**amplify (1)**
17:6
**analysis (1)**
50:21
**analyzing (1)**
35:22
**anticipate (2)**
25:9;29:14
**apart (1)**
24:25
**apologies (1)**
19:4
**apologize (6)**
11:17;19:1;31:4,5;
41:11;51:23
**apparently (1)**
38:5;73:5
**appeal (4)**
22:18;26:12;47:1;
59:21
**appealed (1)**
64:21
**appearance (1)**
17:16
**appearances (2)**
30:18;40:24
**appeared (1)**
40:20
**appellate (1)**
65:6
**application (3)**
15:18;16:3;37:3
**appointed (4)**
19:18;31:12;
43:21;50:9
**appointment (1)**
32:1
**appreciate (4)**
43:18;69:6;74:21,
21
**appropriate (7)**
20:13;26:13;
42:13,18;43:17;
65:9;66:12
**approval (2)**

**33:20;66:17**
**approximately (1)**
59:7
**April (11)**
19:25;33:15;
39:23;49:12;51:16;
56:3,4,8;57:14;
67:10;69:25
**argue (1)**
68:23
**Arie (25)**
6:3;8:16;9:1;
20:17;24:1,16;25:5;
26:2;32:9;34:9,16;
37:19,20;48:8,11;
49:6,9;59:8,18,22,
24,25;61:7,16,17
**arise (1)**
20:6
**arising (1)**
25:23
**arm's-length (1)**
38:9
**Arnold (2)**
20:17;58:11
**around (7)**
35:14,15;51:16;
58:12;62:19;67:24;
73:23
**arrived (1)**
19:17
**artist (1)**
52:9
**aspect (3)**
36:17;37:1,18
**aspects (3)**
33:7;36:18;37:6
**asserted (3)**
15:13;23:19;34:18
**assess (1)**
66:13
**asset (2)**
35:1;54:12
**assets (6)**
41:25;43:6,9,15;
44:24;52:9
**assigned (3)**
23:17;61:8,12
**assignee (1)**
24:3
**assist (1)**
49:8
**Associates (2)**
4:3;65:2
**assumably (1)**
67:10
**assume (1)**
68:5
**Assuming (1)**
57:12
**attempt (2)**
60:14;61:15
**attention (3)**

27:24;56:12;58:3
**Attorneys (6)**
4:3,13,21;5:3,12;
6:3
**attributable (1)**
64:19
**Austin (5)**
42:19,20;44:9;
72:24,24
**automatic (2)**
24:7;67:5
**available (1)**
36:15
**Avenue (1)**
5:4
**awarded (1)**
65:1
**aware (5)**
15:25;19:25;
27:25;72:18,22
**away (1)**
44:15

**B**

**back (11)**
20:21;37:7;39:11,
23;42:8,14;43:15;
48:16;49:7;65:25;
69:22
**background (4)**
11:22;12:3;33:5;
43:24
**baked (1)**
38:6
**balance (1)**
49:20
**ball (2)**
51:7;66:3
**bank (2)**
71:24,24
**bankruptcy (50)**
12:23;13:3,11,14,
15,22,25;14:2,4,4;
18:7;22:2;23:20;
24:16,23;25:3,22;
26:13;31:20,25;32:3,
16;36:16;42:9;43:2,
4,8,11,13;45:8,9;
46:17,19;47:20,22;
52:5,18;54:15,19,23;
55:19,21;56:23;57:1,
7,8;62:1,25;66:21;
71:16
**Barbara (1)**
22:11
**based (2)**
13:11;51:10
**bases (1)**
26:22
**basically (5)**
18:8;40:11;44:14;
52:16;54:11

**basis (3)**
16:11;25:8;36:22
**Battery (1)**
4:14
**behalf (21)**
7:6,15;8:20;9:7,
13,18;10:15,21;
11:15;12:16;13:20;
17:4,21;19:2;27:10;
41:8;48:18;50:12;
52:3;58:7;59:9
**believes (2)**
35:21;36:8
**belong (5)**
24:22;28:14;
43:10;62:10,13
**belonged (2)**
28:15;52:18
**bench (1)**
49:22
**beneficial (1)**
64:20
**beneficiaries (1)**
16:23
**BENSON (2)**
4:20;36:20
**best (1)**
50:1
**better (3)**
11:18;30:18;75:4
**beyond (2)**
69:25;73:4
**bigger (1)**
28:13
**bills (1)**
44:14
**bit (3)**
12:3;23:9;58:16
**both (5)**
22:11;26:1;62:15;
63:6;64:20
**Bowen (2)**
20:16;24:1
**breach (1)**
28:6
**breaches (1)**
16:22
**breach-of-fiduciary- (1)**
28:7
**breach-of-fiduciary-duty (2)**
15:12;22:16
**break (1)**
24:18
**BRIAN (4)**
6:7;8:15;9:2,3
**brief (2)**
11:21;64:10
**briefly (6)**
40:5,14;55:11;
56:17;65:21;72:17
**bring (5)**
19:23;37:24;50:5;
57:11;62:2

**bringing (2)**
28:6;42:25
**Broad (1)**
5:13
**broadly (1)**
61:9
**Broadway (2)**
4:5,22
**Broderick (14)**
25:18;28:3;42:1,7,
14;43:1,7,14;44:22;
57:4,10;62:8;65:25;
66:1
**broke (1)**
66:10
**Broser (5)**
20:17,18;23:5;
58:11,12
**Brosers (16)**
24:1,16;25:6;
26:18;27:4;32:9;
33:19,22;34:9,12;
35:7;36:9,10;42:21;
49:7,7
**brother (5)**
8:6;19:8;34:5;
36:23;38:13
**brought (10)**
24:3;26:20;27:21,
24;42:18,22;43:7,11,
13;62:9
**bucks (1)**
44:14
**built (1)**
60:2
**bulk (1)**
24:17
**burdensome (1)**
12:2
**business (2)**
50:11,16
**businesses (1)**
50:16
**businesspeople (1)**
58:13
**Bye-bye (1)**
75:6

**C**

**call (3)**
21:19;40:10;41:3
**called (4)**
46:11;48:15;
53:14;61:7
**calls (1)**
32:7
**calm (2)**
39:20,21
**came (6)**
19:12;42:4;45:21;
59:21;61:11;63:9
**can (57)**

10:1;14:12;17:4;
18:13,20;20:3,12;
21:6;25:12;27:11,
12;29:18,24;30:9,21;
31:20;39:20,23,23;
40:9,10,17,23;44:14;
47:12,23;49:9;51:4,
13,18;53:25;55:14,
17;56:16,21;57:19,
21;62:22,22,23;
63:21,21;65:5;66:12,
18,18,23;67:4,12;
70:1,5,20;72:12;
73:11,20;74:6,7
**capable (1)**
50:11
**capacity (2)**
26:21;49:6
**captioned (1)**
54:10
**care (3)**
47:19;52:4;71:4
**carefully (1)**
65:5
**Case (69)**
7:2;10:23;11:6,24;
12:13,23,23;13:3,7,
15;20:7;21:1,5;22:2,
13,13,14,23;4,16,17,
18,20;24:15,16,20,
23;25:19,22;27:2;
28:13;30:3;31:2,15;
32:3,6,16,17,22;
38:12,15;39:5;
41:23;42:14,23;43:2,
4,4,5,8,13,21,25;
45:4,17;46:16,20;
47:4;48:3;49:13;
52:21;54:9;56:13;
65:1,24;66:9,21,21;
67:6;70:22
**cases (16)**
14:21;18:2,17;
19:12;21:19;22:9,10,
14,17,19;23:9,11;
27:8;31:13;32:3,4
**cash (1)**
36:6
**cause (1)**
26:25
**CAVALIERE (86)**
7:5,6,10;11:14,14,
17,21;12:7,9,20,22;
13:3,6;14:14,18,22,
25;15:2,6,9;16:16;
17:3,8;18:16,20,21,
22;19:1,1,4,13,22;
20:5,12,24;21:8,12,
14,21,24;22:8;23:15,
23,25;25:14;27:7,14,
23;28:2;29:25;
30:11,13,20,20,25;
31:7,10;40:22;41:1,

4;45:4,15;46:24;
48:5,7;49:15;50:9,
20;51:16;54:8;55:5;
65:14,16,18,18,21,
23;67:23;68:14,18,
19,20,21,22;74:19;
75:3
**Cavaliere's (1)**
53:21
**centered (1)**
16:21
**certain (9)**
39:18;43:25;
64:12,13,25;65:6;
67:23,24;72:8
**certainly (12)**
11:21;15:24;
16:17,19;37:22;
38:7;39:7;50:1,7,11;
55:6;67:3
**cetera (1)**
29:23
**chambers (2)**
68:6;71:1
**chance (3)**
11:7;23:11;50:14
**Chapter (1)**
7:7
**charged (1)**
50:12
**chart (3)**
29:18;30:5;67:20
**charts (2)**
67:16;68:3
**chat (2)**
71:5;74:22
**children (1)**
35:13
**chips (1)**
62:19
**C-H-M-A-N-N (1)**
10:21
**CHRIS (3)**
4:17;10:12;58:6
**Circuit (2)**
25:21;64:22
**circulate (1)**
30:2
**circulated (2)**
70:14,18
**claim (3)**
35:9;37:19;53:23;
62:19
**claimed (1)**
72:24
**claiming (1)**
62:9
**claims (21)**
15:12,16;22:12,16,
16,17,18;23:19;25:8;
34:12;36:23;43:25;
49:3,4,9;50:15;
52:18;54:22;57:4;

62:3;63:9
**claims-administration (1)**
13:13
**clarify (1)**
45:18
**clarity (1)**
51:17
**clear (4)**
17:15;27:16;
45:15;47:2
**clearly (1)**
42:9
**clerk (1)**
14:7
**client (5)**
15:19;19:9;45:23;
61:18;64:23
**clients (2)**
12:16;63:5
**client's (1)**
47:1
**closed (1)**
26:16
**closure (1)**
50:5
**Code (1)**
36:16
**COHEN (2)**
5:11;9:13
**collateral (3)**
50:4;52:6,13
**colleague (4)**
8:15,24,24;54:4
**collect (3)**
60:14,24;61:15
**collection (1)**
43:12
**color (3)**
15:24;17:5;51:17
**coming (1)**
11:3
**commenced (7)**
13:3;19:7,11,14;
20:14;26:17;28:3
**committed (1)**
28:24
**company (9)**
48:15,17,20;51:3;
59:9;60:1,1,6,9
**complaint (3)**
12:15;28:17,18
**complete (2)**
21:15;50:21
**completed (1)**
32:12
**completely (2)**
18:12;46:9
**concern (1)**
28:21
**concerned (3)**
40:13;55:9,10
**concerning (1)**
66:20

**concerns (1)**
29:7
**conclude (1)**
66:23
**concluded (2)**
32:5;75:7
**conclusion (3)**
42:16,25;63:8
**concur (2)**
54:15;56:14
**condo (2)**
35:12,19
**conference (6)**
33:14;45:25;
49:12;51:16;56:15,
19
**conferences (5)**
19:7,21,24,25;
33:16
**confidentiality (6)**
70:17,22;71:10;
72:4,10;73:23
**confirm (2)**
69:10;71:21
**confirmed (1)**
25:20
**connection (4)**
28:11;33:18;35:6;
53:3
**consensually (1)**
51:8
**consent (1)**
55:2
**consented (1)**
18:6
**consequence (1)**
65:7
**consider (2)**
56:1,3
**considerable (1)**
39:9
**consideration (5)**
32:24;36:5;37:20;
54:7;60:5
**constructive (1)**
20:20
**constructive-trust (2)**
21:19;27:18
**contend (2)**
54:14,25
**contentious (1)**
52:11
**contested (1)**
38:1
**contingency (1)**
36:22
**continual (1)**
55:1
**continue (8)**
29:14;31:17;
36:25;39:21,21;
43:17;50:1;59:18
**continued (2)**

34:11;62:23
**continues (2)**
21:5;55:21
**continuing (4)**
25:10;55:2;61:21,
22
**contradicted (1)**
64:15
**contrary (2)**
71:18;73:2
**contributed (2)**
26:1;35:17
**contributing (1)**
36:12
**contributions (1)**
26:5
**control (1)**
66:1
**controversial (4)**
28:12;36:18,19;
37:19
**cooperation (1)**
38:4
**coordinate (2)**
13:23;14:9
**cordial (1)**
29:12
**core (2)**
18:8,9
**corner (1)**
51:17
**corpus (1)**
53:7
**costs (1)**
66:13
**counsel (30)**
11:5;13:9;17:25;
20:1;21:1,1,2;23:13;
24:8,9;28:20;29:13;
30:1;32:8,9;36:20;
41:19;48:8;49:24;
51:21;53:11;54:3,
11;56:10,12,20;
57:23,25;71:14,20
**count (1)**
27:16
**country (1)**
57:13
**couple (4)**
34:18;49:14;55:4,
11
**course (5)**
22:25;40:7;45:16;
65:22;66:24
**COURT (219)**
7:2,9,13,17,18,20,
23;8:2,3,4,6,9,13,17,
19,21,25;9:4,8,11,16,
19,21,23;10:1,4,6,8,
10,14,17,19,22;11:1,
16,20;12:6,8;13:1,2,
5,14,15,25;14:2,4,4,
8,9,12,15,20,24;15:1,

3,5,7;16:6,8,9,10,12,
14,24,25;17:7,9,13,
20,23;18:2,3,7,9,9,9,
11,15,19,21,23;19:3,
6,10,20;20:4,11,23;
21:7,13,17,22;22:7,
10;23:14,22,24;
25:13;27:6,13,15,20,
20,21;28:1;29:9,10,
16;30:4,6,12,14,24;
31:4,8,20,22;33:14;
38:23;39:7,8,25;
40:4,25;41:2,6,10,
13,15;42:1,19;45:9,
18,20;46:22;47:13,
15;48:4,6,8,12;
49:19;50:7,13,24;
51:6,9,14,18,20;
52:1,6;53:7,22,23;
54:2,9,22;55:9,23,
25;56:5,7,9,9;57:15,
17,19,21,24;58:2,4,
10,15;60:21;63:12,
18,20,23,25;64:2,6,
8;65:7,11,15,17,20,
22;66:17;67:13,13,
22;68:7,8,17,19,21,
23;70:9,11,15,21,23,
25;71:4,9,12;72:14,
16,19,21;73:2,15,18,
20;74:5,17,22;75:6
**courtroom (2)**
11:4;71:15
**courts (4)**
22:25;62:20;
64:16;65:6
**courts' (1)**
22:24
**court's (2)**
16:20;20:9
**covered (1)**
27:8
**covering (1)**
26:21
**create (1)**
60:13
**created (5)**
60:12;61:7;62:12,
17,20
**creditor (10)**
8:11;10:24;24:4,
10,11;26:21;34:14;
68:16,16,18
**creditors (7)**
37:11;42:10;
44:16,25;66:18;
68:12,15
**creditors-of-this- (1)**
44:9
**criminal (1)**
72:6
**cross (1)**
27:18

3,5,7;16:6,8,9,10,12,
**cross-claims (1)**
15:14
**crystal (1)**
66:3
**Cullen (1)**
9:17
**cures (1)**
72:13
**curious (1)**
11:10
**current (5)**
15:20;33:10;
37:14;67:17,21

**D**

**D&K (5)**
5:3;9:25;10:3,5;
22:15
**Dalia (28)**
5:3;9:25;10:3,7;
15:11,13,18;16:3;
19:7;20:14;21:1;
22:13,14;25:18,24;
26:2,4;34:4;36:24;
56:10;59:25;60:8,17,
19,25;62:2,11,12
**D-A-L-I-A (1)**
10:7
**damage (3)**
50:4;52:6,13
**DANIEL (2)**
5:2,8
**date (3)**
33:14,15;57:23
**dates (2)**
19:21;69:23
**daughter (4)**
26:6;48:19;50:6;
60:3
**David (2)**
20:18;58:11
**Davis (7)**
32:16;37:5;38:14,
19;46:17;52:15;
58:21
**day (3)**
52:8;53:12;73:8
**days (5)**
24:13;25:11;32:1;
33:20;43:21
**deadline (3)**
45:5;47:10;56:18
**deal (4)**
22:15,16;31:24;
51:9
**dealing (1)**
33:6
**deals (1)**
13:21
**dealt (3)**
13:12;51:5,5
**Deborah (5)**

7:6,7;19:9,18;
20:19
**debt (3)**
50:16,17,17
**Debtor (33)**
6:13;8:20;9:7;
10:25;15:25;20:15;
23:18;25:23;26:12,
21;28:8,11,14;35:14,
18,19,24;36:1,13;
42:9,21;43:15;
44:24;50:3,15;51:2;
52:3,6,24;54:18;
66:24;72:24;73:1
**debtors (2)**
13:7;15:15
**debtor's (13)**
8:6,16;10:9;20:1,
17;23:12;35:11;
36:20;41:24;43:6;
48:14;52:9,18
**decade (1)**
44:18
**decedents (1)**
18:4
**December (1)**
19:17
**decide (7)**
38:20;43:1,14;
44:22;46:23;50:8;
67:7
**decided (11)**
21:14;22:21;37:4;
38:15;42:12,15;
46:25;47:1;49:8;
64:13;66:5
**decides (3)**
42:3,7,11
**deciding (1)**
46:20
**decision (1)**
46:17
**decisions (1)**
50:11
**defendants (1)**
54:20
**defending (2)**
20:1;35:3
**defenses (1)**
43:25
**defined (1)**
34:4
**definitely (1)**
53:6
**Delaware (1)**
60:13
**delay (1)**
39:9
**delayed (1)**
57:8
**deleterious (1)**
39:17
**DELLAPORTAS (14)**

4:9;7:15,24;27:9;
64:4,9;71:14;72:2,
17,20,20,22;73:12;
74:9
**demand (1)**
26:7
**demanded (1)**
26:10
**demonstrate (1)**
66:18
**described (2)**
44:11,12
**description (1)**
29:19
**destructions (1)**
50:19
**detailed (1)**
29:20
**determination (2)**
24:15;29:2
**determine (1)**
28:14,24;45:20
**determined (1)**
26:11,13;28:23
**different (2)**
14:8;39:2
**difficult (1)**
63:10
**direct (1)**
12:3
**directed (1)**
13:8
**directly (1)**
26:9
**disagree (4)**
52:14;53:20;
54:24;55:14
**discharge (9)**
19:5;20:9;21:19;
27:17;29:23;47:7;
53:24;67:1,2
**discount (1)**
66:15
**discovery (5)**
45:14;46:4;53:8,
16,18
**discrete (1)**
53:14
**discuss (3)**
25:12;57:23,24
**discussing (1)**
37:20
**discussion (1)**
72:3
**discussions (8)**
23:12;28:20;29:4,
12;47:18;48:1;
56:20;74:7
**dismiss (31)**
28:18;35:4;38:14,
15,17,18,24;39:1,10,
15;41:17;42:13,17,
18;45:13;46:3,6;

47:12,17,24;52:14,
17,23;53:9,20;55:16,
17,21;56:22;65:4;
66:8
**dismissal (3)**
38:20;53:5;56:24
**dismissed (4)**
46:16;47:21;
60:25;65:25
**dispute (5)**
16:13,21;25:7;
59:23;67:18
**disputes (3)**
51:1;52:7;67:23
**distributed (1)**
61:13
**distribution (2)**
60:1,18
**District (19)**
11:12;12:25;13:1,
4,10,16;14:9;19:18;
27:20,21;42:1,24;
52:20;54:9,22;55:9,
23;64:18,25
**district-court (2)**
31:22;54:21
**division (1)**
65:6
**divorce (3)**
26:3;48:17;59:24
**divorced (1)**
26:3
**docket (2)**
14:11;68:7
**document (3)**
51:11;53:14;61:13
**document-and-discovery (1)**
51:13
**documents (4)**
11:8;15:23;50:10;
69:5
**dollar (1)**
35:7
**dollars (32)**
23:7;24:18;25:23;
26:20;33:20,21,22;
34:13,25;35:9;
36:11;42:4,8;43:9,
15;48:23,24;49:1;
50:7;54:13;58:18,
21;59:3,4,6,8,11,12,
16;61:16,19;66:4
**done (12)**
20:2;31:1,5;35:17;
43:18;44:23;46:19;
51:6,18;66:8;70:20;
72:13
**door (1)**
61:11
**doubt (1)**
73:13
**down (3)**
41:2;56:2;69:13

**dozen (2)**
22:25;31:14
**draft (1)**
34:21
**drafting (1)**
11:23
**draining (1)**
35:1
**Drogin (1)**
11:15
**due (2)**
25:1;33:25
**dug (1)**
43:19
**during (4)**
12:24;22:2;39:23;
47:22
**duty (3)**
16:22;28:7,8
**dwindling (1)**
49:23
**Dykman (1)**
9:18

---

**E**

**earlier (5)**
36:25;57:22;
64:23;65:24;67:7
**early (2)**
32:25;33:4
**effect (1)**
39:18
**efficient (1)**
42:24
**Effort (3)**
28:3,18;37:11
**efforts (4)**
37:25;39:24;
43:12;59:18
**either (3)**
11:5;29:8;72:14
**electronically (2)**
68:5,8
**eleven (2)**
27:11;46:24
**Elizabeth (1)**
9:17
**Ellman (1)**
28:9
**Ellman's (1)**
68:16
**else (9)**
8:23;9:23;10:11;
11:2;43:9;45:24;
60:11;65:12;71:5
**elsewhere (1)**
16:8
**embroiled (1)**
52:11
**EMMET (3)**
4:2;7:14;41:8
**employed (1)**

53:19
**enable (1)**
44:1
**end (6)**
13:20;16:13,14;
31:21;52:8;53:20
**ended (2)**
16:20,24
**energies (1)**
39:24
**engaged (1)**
62:6
**enjoin (1)**
16:3
**enough (4)**
42:9;44:24;45:23;
68:11
**enter (2)**
47:23,24
**entered (3)**
13:24;14:10,21
**entering (1)**
42:20
**enterprise (1)**
25:25
**Enterprises (1)**
26:1
**entire (1)**
47:3
**entirety (1)**
60:10
**entities (2)**
62:11,20
**entitled (6)**
16:1;35:9;38:2;
50:24;57:9;66:25
**entitlement (2)**
49:20;53:3
**entity (7)**
8:9;25:5;27:4;
28:4,5;33:22;58:13
**entry (1)**
70:21
**envision (1)**
67:25
**equal (1)**
60:18
**equally (1)**
48:19
**equitable (1)**
60:22
**equity (4)**
48:16,24,25;60:21
**Eric (7)**
4:21,25;10:20;
20:18;34:13;35:11;
63:15;71:7;73:10
**escrow (1)**
62:5
**ESQ (9)**
4:8,9,17,21,25;5:8,
17;6:7,8
**essentially (5)**

16:3;25:15;32:25;
46:9;52:13
**establish (1)**
46:4
**established (3)**
45:13;60:2,3
**estate (27)**
8:12;13:13;18:4;
23:20;24:23;25:3;
29:1;35:10,25;36:11,
15;39:18,22;42:4,6,
8;43:6,16;44:16;
46:21;50:12;53:7,9;
54:16,19,23;57:7
**estate's (1)**
44:10
**et (1)**
29:23
**eve (3)**
41:24;45:5;46:10
**even (2)**
64:12;71:14
**eventually (1)**
43:14
**everybody (2)**
21:11;60:10
**everybody's (3)**
21:10;58:8,24
**everyone (7)**
21:16;30:8;39:12;
41:1;53:1;68:22;
70:6
**everywhere (1)**
23:2
**evidence (1)**
38:9
**exactly (2)**
74:3,16
**example (3)**
39:3;53:18;66:21
**exception (1)**
18:10
**excess (2)**
58:20;59:6
**excuse (5)**
8:21;13:2;14:16;
18:21;68:17
**exhausting (1)**
26:12
**expectation (1)**
38:5
**expenses (1)**
50:6
**expensive (1)**
58:21
**experience (1)**
66:5
**explain (1)**
18:5
**extending (2)**
56:1,3
**extensively (1)**
43:23

**extent (8)**
13:21;22:5;26:24;
28:25;34:14;35:8;
39:12;65:6

## F

**face (3)**
33:24;38:17;51:2
**fact (6)**
23:2;31:23;36:1;
52:8;73:1;74:10
**factual (2)**
20:6;52:24
**Fair (3)**
30:11,13;74:2
**familiar (1)**
16:11
**family (13)**
11:24;22:23;
25:25;52:7,11;59:9;
60:1,5,6,9,10,15,18
**Fantastic (1)**
41:4
**far (13)**
20:24;21:18;
24:21;25:15;29:4,
13;31:2;40:13;52:9;
57:11;62:4,6;71:4
**fashion (1)**
73:6
**father (5)**
8:16;42:21;48:14,
14;50:5
**favor (2)**
39:13;47:2
**favorable (1)**
39:12
**February (6)**
13:18;14:23;
28:19;32:11,13;33:1
**federal (1)**
65:6
**federal- (1)**
18:10
**federal-court (1)**
32:4
**Feel (5)**
11:18;29:9;52:6;
65:4;75:3
**fees (3)**
34:23,25;61:22
**few (4)**
32:1;33:12;41:17;
44:14
**fiduciary (3)**
16:22;28:7;66:10
**fierce (1)**
37:1
**fifteen (9)**
11:25;23:1;31:16;
39:4;41:20,21;
50:17;52:7;64:12

**fifteen- (1)**
24:25
**fifteen-year (1)**
22:23
**fifty (2)**
49:7;59:4
**fight (1)**
26:4
**figure (2)**
30:7;40:10
**figuring (1)**
21:10
**file (6)**
26:13;32:18;37:3;
56:17;62:25;66:18
**filed (24)**
12:15;15:14;19:6;
21:2;27:2;28:17,17,
18;38:13;41:23;
42:1;43:2,4,5;45:4,8,
8;47:9;59:22;62:2;
68:5,9;69:5;71:17
**filing (6)**
25:22;31:19,25;
34:12;68:6;71:17
**final (1)**
64:15
**finally (3)**
42:15;55:16;66:23
**financial (1)**
72:15
**find (2)**
16:8;49:18
**findings (1)**
67:24
**fine (9)**
11:20;21:17;
40:22,24;41:14;
51:24;64:8;70:10;
71:2
**firm (2)**
28:10;55:13
**firms (5)**
28:8,9,10,17;39:2
**first (4)**
8:2;30:1;37:12;
56:25
**five (3)**
31:17;50:6;55:5
**flavor (1)**
56:16
**Floor (1)**
5:14
**focus (6)**
20:10;23:3,4,8;
32:14;39:24
**focused (1)**
23:3
**focusing (1)**
37:13
**folks (5)**
29:24;32:11;
40:20;69:10,21

**follow (2)**
46:12;55:15
**follow-up (1)**
51:15
**force (1)**
69:13
**foremost (1)**
56:25
**forestall (1)**
47:17
**forgive (1)**
16:11
**forgot (1)**
27:25
**form (2)**
29:18;47:19
**formally (1)**
29:11
**formed (1)**
28:5
**former (1)**
36:20
**Forrest (3)**
25:17;26:11;64:18
**forth (3)**
67:19,24;73:7
**Fortunately (1)**
31:19
**forty-five (2)**
24:13;25:11
**forty-four (1)**
59:12
**forty-two (1)**
53:14
**forum (1)**
66:22
**forward (18)**
26:16;29:8,15;
34:24;40:13,19;47:8,
11;48:3;51:7;53:20,
21;54:1;55:10,17;
69:20;74:7,13
**fought (1)**
57:6
**found (3)**
49:19;64:25;72:25
**founder (1)**
48:14
**four (2)**
33:6;35:24
**FRANK (4)**
6:8;8:14;9:20;
48:10
**frankly (10)**
17:25;22:22;23:1;
29:3;38:8;39:3,4;
44:2;57:7;62:24
**fraud (2)**
22:17;71:16
**fraudulent (4)**
23:7;26:24;33:18;
44:21
**fraudulent-inducement (1)**

22:15
**fraudulently (1)**
42:5
**Freeman (1)**
23:16
**Freeman's (1)**
72:8
**fresh (1)**
66:25
**Friday (1)**
46:8
**frightened (1)**
73:6
**frivolous (1)**
53:6
**front (2)**
27:20;51:6
**fruitful (1)**
48:2
**full (4)**
18:1;56:16;57:4;
73:3
**fully (3)**
36:7;38:6;50:11
**fund (2)**
48:18;58:8
**funded (6)**
50:6;58:16,20,25;
59:1;61:10
**funder (3)**
10:16;15:19;61:25
**funding (2)**
49:8;61:17
**funds (1)**
54:13
**further (4)**
22:5;47:16;53:25;
73:4
**futile (1)**
53:5
**future (1)**
22:6

## G

**garage (1)**
36:2
**Gart (1)**
58:5
**GARTMAN (13)**
4:17;10:12,12,15,
18;27:5;58:5,6,6,11,
16;64:7,14
**G-A-R-T-M-A-N (1)**
10:13
**Gartman's (1)**
15:19
**gating (2)**
47:3;74:15
**gave (1)**
34:23
**Gener (1)**
51:21

Genger (136)
  4:3;5:3,12;6:3,12;
  7:2,16,16,25;8:1,4,
  16;9:7,13,18,25;
  10:7;13:20,21;15:11,
  13,14,18;16:3,23;
  17:4,12,21;19:8,8,8;
  20:15,15,17,18;22:1,
  12,13,13,14,15,19,
  23;24:1,1,3,5,9,11,
  12,16;25:3,4,5,6,18,
  18,18,19,24,24,25;
  26:1,2,17,18,20,25,
  25;27:10;28:5,11,15,
  20;31:24;33:11;
  34:3,9,9,11,16;
  35:20;36:19;37:19;
  38:5,13;41:8;43:10;
  44:15;45:5;48:8,11,
  13,18;49:2,6,8,9;
  51:4;52:4;53:10;
  54:3,6,14,17;56:10;
  57:3,8;59:8,9,18,22,
  24,25,25;60:8,9,13,
  17,24,25;61:6,6,7,7,
  12,17,23;62:2,2,10,
  24,24;71:15,22;72:2
GENGER# (1)
  6:13
Genger's (6)
  21:1;32:8,9;37:20;
  42:4;49:1
gets (1)
  65:24
gift (1)
  35:23
gifted (1)
  51:3
given (3)
  56:13,15;69:16
glad (1)
  11:22
global (1)
  45:2
goes (2)
  53:20;69:25
Good (17)
  7:5,8,10,12;8:14;
  9:12,15,24;10:12;
  17:11;35:16;41:7;
  48:10;54:5;56:11;
  70:7;73:23
GP (4)
  5:3;9:25;10:3,5
grant (2)
  38:18;66:2
granted (2)
  38:16;47:3
gravamen (1)
  48:15
great (2)
  17:9;56:7
Group (18)

  15:21;16:4;25:1;
  34:1,3,4,6,6,8,19;
  35:3;58:17,24;59:10,
  20;61:2,6;69:23
guess (4)
  21:8;26:20;35:16;
  49:11
guys (2)
  12:12;74:11

**H**

half (1)
  26:10
handled (1)
  13:19
hang (1)
  68:1
happen (3)
  10:24;24:14;67:3
happened (3)
  13:14;42:5;60:7
happening (2)
  44:18;60:16
happens (3)
  42:3;46:20,23
happy (8)
  30:21;40:14;
  47:23;56:21;57:1,
  23;58:1;73:9
harass (1)
  62:23
hard (1)
  55:19
hasn't# (1)
  44:18
head (1)
  39:16
hear (9)
  12:10;14:18;
  16:14;18:7;30:7;
  40:5,14;49:2,10
heard (22)
  29:7;30:15;39:7;
  40:7,11;52:21;58:5,
  12,14,22;59:2,2,4,5,
  23;61:4,18;62:8,10;
  63:14;65:12,21
hearing (11)
  25:12;38:24;39:9;
  40:1;45:12;46:10;
  60:23;65:3;67:8,10;
  73:22
held (2)
  34:10;54:18
Hellerstein (4)
  13:18,24;14:17,21
help (1)
  47:22
helpful (2)
  32:6;69:9
here's (1)
  65:13

H-E-R-S- (1)
  10:20
Herschman (1)
  63:15
Herschmann (30)
  4:21,25;10:20,20,
  24;20:17,18;32:11;
  34:13;35:11,21;
  36:4;63:13,15,19;
  71:7,8,10,13;73:3,
  10,10,15,16,17,19;
  74:3,8,14,16
Herschmann's (2)
  36:21;68:18
herself (1)
  9:14
Hi (1)
  11:16
hide (1)
  63:7
high-level (1)
  12:2
himself (1)
  35:24
hindsight (1)
  35:17
hired (3)
  71:20,22;72:25
history (2)
  32:22;71:24
hit (1)
  14:11
hold (11)
  7:20;8:19,21,21,
  21,21;9:16;39:16;
  56:21,21;68:21
holding (3)
  59:9;60:6,9
holiday (1)
  57:16
home (2)
  35:18;44:23
homestead (1)
  35:13
homework (1)
  33:2
Honor (106)
  7:5,8,11,12;8:8,14;
  9:12,15,22,24;10:12,
  20;11:14,18,23;
  12:22;13:11;14:8,11,
  18,25;15:6,9,21,24;
  17:11,18;18:16;19:5,
  22;20:5;22:8,22;
  23:15;25:14;26:22;
  27:23;28:14;29:25;
  30:4,5,20;31:7,11,
  12;32:15;33:6;
  34:19;37:7;38:12,20,
  25;39:1,22;40:3;
  41:4,7,16;43:3;
  45:14;46:2;47:16;
  48:5,10,23;49:11,12;

  50:15;51:19,24;
  54:5;56:12,17,25;
  58:1,6,9;60:7,11,15;
  61:4,10;63:11,15,24;
  64:1,9;65:14,21;
  66:11,15;67:6;68:2,
  14;70:7,10,12,24;
  71:3,7;72:17;73:10;
  74:3,16;75:3,5
Honor's (3)
  54:7;67:7,8
hope (8)
  20:5;21:3;29:14;
  30:9;39:8;55:7;
  69:15;70:22
hoped (1)
  11:9
hopeful (3)
  33:12;46:8;74:23
hopefully (5)
  40:1;67:3,12;
  70:20;74:11
hopes (1)
  43:25
hoping (7)
  23:2;29:11;35:5;
  39:1,7,20,22
housekeeping (2)
  57:12;70:13
HUBBARD (3)
  4:12;10:13;58:7
HUGHES (3)
  4:12;10:13;58:7
hundred (2)
  62:13,15
hundred-percent (1)
  62:21
hundreds (1)
  31:13
husband (3)
  20:17;35:11,24
husbands (1)
  35:16

**I**

I-A (1)
  9:20
identify (2)
  12:1;29:22
illegality (1)
  72:22
illegally (3)
  71:23,25;72:5
impact (4)
  15:15;23:18,19;
  69:17
impeachment (1)
  32:12
impede (1)
  55:22
implementation (1)
  65:9

implicate (1)
  20:7
implicates (1)
  24:7
important (3)
  46:19;50:13;70:19
impose (1)
  20:19
improve (6)
  32:23;33:4,7;36:5;
  37:12,14
improved (1)
  37:21
improving (1)
  39:24
Inc (7)
  4:4;23:21,25;28:3,
  18;48:15;59:19
include (2)
  34:4;74:8
included (1)
  59:14
includes (1)
  18:3
including (2)
  15:19;23:5
incurred (2)
  34:24,25
indemnification (1)
  34:22
indemnify (1)
  26:10
indemnity (1)
  25:23
independent (1)
  66:10
indicated (2)
  53:11;69:24
indicating (1)
  28:21
indiscernible (1)
  38:3
individual (2)
  49:6;66:12
individually (2)
  51:2;54:18
informal (1)
  55:2
information (8)
  32:5;43:24;63:7;
  71:21;72:1,5,8,14
initial (3)
  23:8,12;28:19
initially (5)
  16:21,24;20:25;
  26:8;30:22
inquiry (1)
  72:5
insofar (2)
  28:22;36:19
installations (1)
  52:10
instance (1)

15:10
**instances (1)**
  62:15
**instead (1)**
  45:8
**integrated (1)**
  36:7
**intended (1)**
  59:25
**intent (1)**
  32:20
**intention (3)**
  13:10,12;38:7
**intercreditor (2)**
  34:17;62:17
**interest (11)**
  35:18,19;43:9;
  45:1;48:16;49:1;
  50:1;60:5,6;61:21;
  64:20
**interested (2)**
  44:16;47:19
**interests (2)**
  50:8;59:19
**interferes (1)**
  54:23
**interim (3)**
  24:13;53:25;74:6
**interrupt (5)**
  12:20;17:1,14;
  19:11;73:16
**intervene (1)**
  29:10
**intimidating (1)**
  71:16
**into (14)**
  13:24;14:12;15:1;
  18:13;23:9;33:10;
  37:11;42:4,8,20;
  47:23,24;72:3,10
**introduce (1)**
  9:14
**investigate (2)**
  53:23;71:21
**investigated (3)**
  28:24;63:3,5
**investigation (2)**
  37:25;72:6
**investigator (3)**
  71:22;72:25;73:6
**Investment (2)**
  4:3;65:1
**Investments (4)**
  7:16,25;8:11;41:9
**involve (3)**
  15:8,8,9
**involved (9)**
  16:17;19:23;
  21:25;27:10;34:7;
  49:13;50:16;53:1;
  58:22
**IRA (4)**
  5:2,8;9:24;56:11

**Israel (4)**
  71:18,20;72:6;
  73:1
**Israeli (2)**
  71:23;72:25
**issue (11)**
  21:3;22:22;25:9;
  47:3;61:21;65:1;
  69:11;71:8;72:23;
  73:8;74:15
**issued (2)**
  14:16;53:3
**issues (17)**
  12:1;13:13;20:6,6;
  36:20;43:20;49:16;
  50:23;51:4;63:1,3,4;
  67:7;72:7;73:23;
  74:10,10

## J

**Jaffe# (1)**
  22:11
**January (2)**
  32:10,13
**Jenna (1)**
  14:7
**job (2)**
  38:1;39:6
**JOHN (3)**
  4:9;7:15;72:20
**join (1)**
  56:12
**joined (1)**
  56:23
**joint (1)**
  13:24
**Judge (36)**
  13:18,23;14:16,
  21;22:11;23:17;
  25:17,17,17;26:11;
  27:20;28:3;32:16;
  37:4;38:14,19;42:1,
  7,14,25;43:7,14;
  44:11,21;46:17;
  52:15,15;57:4;60:13,
  16,22,23;64:18,25;
  65:25;66:1
**judges (4)**
  31:22,22;44:4;
  64:12
**judgment (3)**
  25:19,22;26:21
**judgments (1)**
  66:13
**Julia (1)**
  52:2
**Julie (2)**
  8:18;9:6
**July (7)**
  12:24;13:2,4;
  26:14;31:25;45:4;
  61:3

**jump (2)**
  20:12;68:14
**June (5)**
  20:22;25:21;61:3,
  5;62:1
**jurisdiction (4)**
  16:12;18:3,10,11
**jurisdictions (1)**
  73:13
**Justice (2)**
  57:9;72:7

## K

**Kailas (1)**
  9:6
**KASOWITZ (8)**
  4:20;20:16;21:25;
  22:10;27:11,18;
  36:20;68:15
**Keenan (1)**
  64:25
**keep (3)**
  21:23;37:19;39:21
**kind (5)**
  22:20;41:18;
  43:20;47:6;55:1
**known (1)**
  27:4
**Krause (1)**
  28:9
**Krinsky (5)**
  7:6;11:15;19:2;
  31:2;65:18

## L

**largescale (1)**
  52:10
**last (8)**
  7:21;9:8,19;23:1;
  41:23;45:4,16;60:15
**later (5)**
  23:9;39:7;49:4,10;
  57:22
**laud (1)**
  45:1
**LAW (5)**
  5:2;28:8;39:14;
  55:13;71:23
**lawsuit (1)**
  61:5
**lawyers (1)**
  58:21
**lawyers' (1)**
  45:6
**lay (1)**
  65:5
**lead (4)**
  24:8,9;49:14;69:7
**leading (1)**
  45:25
**leases (1)**

34:6
**least (10)**
  16:21;20:25;
  44:25;66:24;68:12;
  69:14;72:11,14;74:6,
  14
**leave (2)**
  34:19;69:21
**led (2)**
  25:19,21
**left (3)**
  34:19;35:2;69:2
**legal (3)**
  34:23,25;61:22
**legitimate (2)**
  42:10;44:16
**less (1)**
  53:15
**letters (1)**
  67:9
**Lexington (1)**
  5:4
**liabilities (1)**
  52:9
**lien (3)**
  35:8;36:8,12
**life (2)**
  63:22;67:4
**light (3)**
  26:4;32:22;38:8
**lightly (1)**
  60:11
**likelihood (1)**
  66:8
**likely (1)**
  44:7
**likewise (1)**
  71:25
**limbo (1)**
  45:3
**limitations (1)**
  21:3
**limited (2)**
  53:7,9
**line (1)**
  34:16
**lines (1)**
  43:12
**liquidated (1)**
  26:8
**listening (1)**
  64:14
**litigate (2)**
  55:4;59:18
**litigating (2)**
  44:3;54:20
**litigation (57)**
  10:16;11:11,13,
  24;12:14,18;15:19;
  16:5;18;20:18;
  22:24;23:2;24:2;
  25:4;26:18;27:11;
  31:15,17,21,24;

36:13;37:25;39:3,
  15;41:20,21;42:2,3,
  6,11;43:17;45:12;
  49:8;50:2;52:12;
  53:19;56:2;58:8,17,
  23;59:1;60:12;61:1,
  7,9,10,11,12,17,23,
  25;62:7;66:1,13,14,
  23;68:4
**litigations (9)**
  34:7;46:24;47:8,
  11;49:16;50:18;
  52:7;64:11;67:16
**litigation's (1)**
  34:11
**little (4)**
  17:5;31:1;32:21;
  58:16
**live (2)**
  35:13;70:1
**lived (1)**
  72:24
**LLC (6)**
  4:13;5:3;10:16,19;
  58:7,13
**LLP (5)**
  4:2,12,20;5:11;6:2
**long (5)**
  23:10;40:22;44:3;
  55:17;61:5
**longer (2)**
  25:10;45:3
**look (7)**
  14:12;15:1;23:9;
  44:8;50:14;71:2;
  74:11
**looked (1)**
  44:11
**looking (2)**
  32:2;51:7
**lose (2)**
  44:22,23
**lost (1)**
  68:10
**lot (12)**
  11:7;30:15;35:2;
  37:11;51:11,17;
  58:12;59:3;61:18;
  65:3;67:5;69:2
**love (1)**
  44:6
**luck (1)**
  39:11

## M

**Magistrate (1)**
  23:16
**main (2)**
  24:10;54:12
**Maine (4)**
  23:21,25;24:9;
  26:23

**M-A-I-N-E (1)**
23:25
**Maines (1)**
24:4
**major (1)**
32:7
**majority (1)**
60:5
**makes (1)**
21:15
**making (8)**
16:4;33:11;37:16,
22;38:10;50:11,12;
69:1
**malpractice (3)**
28:6,23,25
**Manhattan (9)**
23:20,22,23;24:4,
8;26:23;54:10;56:2;
62:11
**many (12)**
31:24;38:8;40:16;
43:20;50:7,21,23;
51:6;52:12,12;
66:24;73:5
**March (4)**
24:14;53:15;55:3;
56:4
**marriage (1)**
35:16
**married (1)**
35:15
**MARTIN (3)**
4:2;7:14;41:8
**MARVIN (3)**
4:2;7:14;41:8
**massive (1)**
66:23
**materials (1)**
56:15
**matter (12)**
12:16;16:18;
26:15;27:1;52:8;
54:20,21,21;56:24;
57:12;62:18;70:13
**matters (27)**
12:7,25;13:9,12,
17,19,25;14:6,10;
15:3,4,10,17;17:2;
18:4,6,9,20;20:7;
21:18;31:25;32:14;
33:16;36:25;38:1;
42:2;47:3
**maximize (1)**
20:8;38:2
**may (15)**
15:23,25;22:18;
23:1,18,19;24:20;
28:13;32:5;39:18,
19;47:18;66:14,15;
68:14
**maybe (7)**
14:7;55:6,6;66:2;

67:4;68:24;73:11
**mean (3)**
17:1;29:4;61:10
**meantime (1)**
34:11
**mechanical (1)**
68:3
**mediators (1)**
44:4
**meet (1)**
32:13
**meet-and-confers (1)**
46:12
**meetings (1)**
50:10
**members (1)**
58:13
**memos (1)**
43:23
**mention (1)**
27:25
**mentioned (10)**
48:13;50:21;54:8,
11,24;55:3,5,6,12,12
**meritless (1)**
63:10
**merits (2)**
52:23;66:3
**met (6)**
32:9,10,10,11;
33:1;35:14
**meter (1)**
61:20
**method (1)**
42:25
**Michael (2)**
20:15;24:1
**mid-December (1)**
32:25
**mid-February (1)**
33:4
**might (1)**
7:11
**million (40)**
23:7;24:18,19,19;
25:23;26:19;33:25,
25;34:13,14,18,19,
25;35:9,21;36:11;
42:3,8;43:8,15;
46:23;48:23,24;
49:1;50:7;54:13;
58:18,20;59:3,4,6,8,
11,12,16;61:16,19;
64:17;66:4,15
**million-dollar (4)**
16:2;25:1;49:21;
62:5
**mind (1)**
44:2
**minute (1)**
64:3
**mispronounced (1)**
41:10

**mispronouncing (1)**
51:22
**missed (2)**
21:22;27:9
**Missry (1)**
28:10
**misstatements (1)**
52:24
**mistake (1)**
69:1
**misunderstandings (1)**
41:19
**mom (1)**
10:9
**moment (1)**
68:25
**Monday (2)**
53:11,12
**monetized (1)**
64:19
**money (20)**
23:5;26:7,8;34:8;
35:2,5;36:9,14;
50:25;52:24;54:19,
24;59:14,17;60:19;
61:18;64:18,24;
68:11,22
**money's (1)**
34:10
**monies (6)**
24:22;34:15;
36:10,10;55:13;57:6
**monitoring (1)**
49:24
**month (3)**
19:16;39:23;66:5
**months (4)**
45:9,11,16;73:5
**M-O-O (1)**
9:3
**MOORE (6)**
6:7;8:15;9:2,2,3;
48:9
**more (13)**
15:24;17:5;23:1;
31:17;33:12;36:18;
44:24,25;51:5,17;
55:4,5;61:19
**morning (16)**
7:5,8,10,12;8:14;
9:12,15,24;10:12;
17:11;41:7;48:10;
54:5,7;56:11,13
**most (8)**
32:9,10;33:1;38:3;
42:24;46:19;51:9;
63:19
**mostly (1)**
44:12
**mother (7)**
15:13;19:8;20:15;
26:10;34:4;36:24;
52:10

**motion (42)**
18:13;22:1;32:17;
38:13,17,18,24;39:1,
10,15;40:2;41:17,25;
42:13,17,18,19;43:1;
45:13;46:3,5,15,18;
47:2,12,17,24;52:14,
16,23;53:5,19;55:16,
17,20;56:22,24;62:9;
65:4;66:2,6,9
**motions (7)**
18:7,12,14;28:17;
35:4;53:8,9
**move (9)**
40:19;48:3;54:1;
55:10,17;63:21;
67:4;69:20;74:6
**moving (8)**
11:7;21:23;26:16;
38:8;39:6;40:13;
67:11;74:13
**Mrs (1)**
57:3
**much (18)**
9:4;11:9;31:8,8,
10;48:6;51:5,20;
52:4;54:2;58:2;69:6;
73:1;74:19,21;75:2,
3,6
**much-improved (1)**
33:13
**multiple (2)**
62:20,20
**myself (1)**
10:21

## N

**name (10)**
7:21;8:2;9:8,19;
18:24,25;23:20;
41:10;51:22;58:12
**nature (2)**
47:17;50:15
**necessary (1)**
18:13
**need (16)**
18:11;29:20;31:9;
32:23;39:4,19;42:9;
45:21;46:15;47:8,
11;57:11;63:1;65:8;
71:5;72:13
**needed (2)**
26:7;66:22
**needs (4)**
22:5;42:12;48:3;
66:8
**negotiated (1)**
48:22
**negotiations (2)**
33:3;38:9
**New (22)**
4:6,15,23;5:6,15;

6:5;11:12;13:10,16;
15:4;19:12;22:3;
27:19;30:3;45:20,
21;46:1,1;49:14;
52:20,21;62:2
**newly (1)**
62:20
**next (7)**
9:5;21:24;30:8;
33:14;39:23;70:4;
74:25
**nice (1)**
45:23
**nightmare (1)**
31:21
**nine (3)**
39:2,2;53:11
**Nobody (1)**
45:24
**non-bankruptcy-estate (1)**
54:24
**nondebtor (6)**
54:10,25;55:13,13,
18,22
**none (1)**
47:3
**Nonetheless (1)**
49:18
**nonstarter (1)**
52:17
**Normally (2)**
13:1;14:1
**note (6)**
16:1;17:16;18:23;
25:1;33:23,24
**noted (1)**
30:18
**notes (3)**
33:24;53:3;62:5
**November (2)**
19:16,16
**Number (11)**
7:2,10;15:9,10;
36:19;43:23;44:4;
45:15;46:25;47:11;
50:10
**Numerous (1)**
51:12
**NY (6)**
4:6,15,23;5:6,15;
6:5

## O

**object (4)**
30:15;39:14;
40:20;67:2
**objectionable (1)**
37:10
**objections (8)**
15:15;29:10;
32:18;37:1,4;47:7;
51:9;66:18

**obligation (4)**
25:23;26:11;
34:22;66:16
**obtain (5)**
57:4,9;62:15;
66:14;73:14
**obtained (6)**
25:22;60:8;71:23,
25;72:5,15
**obviously (12)**
13:21;20:12;25:7;
27:2,9;33:9;35:20;
58:19;61:14,19;66:1,
4
**occasions (1)**
51:6
**occur (2)**
44:7,8
**occurred (1)**
72:12
**October (3)**
13:6;19:14;52:16
**off (5)**
30:9;47:6,12;
53:24;66:15
**OFFICE (1)**
5:2
**offset (1)**
34:23
**old (1)**
71:24
**once (3)**
7:20;44:25;74:10
**One (32)**
4:14;6:4;7:20;
9:16;11:10;12:9;
13:20;15:10,17;
21:24;22:12;27:9,20,
25;28:9,13;29:16;
31:20;32:14;36:17;
45:22;62:12,20;64:3,
11;65:4;66:22;68:2,
9,12;70:13;71:8
**one-half (2)**
35:18,19
**one's (1)**
50:1
**ongoing (1)**
72:6
**only (5)**
42:2;45:22;56:8;
62:24;72:24
**open (1)**
63:6
**opportunity (2)**
32:13;74:11
**opposed (1)**
25:11
**opposition (1)**
71:17
**order (18)**
13:25;14:10,16,20,
23;19:15;30:17;

36:15;40:19,23;
43:5;45:6;46:10;
70:22;71:10;72:3,8,9
**orders (1)**
74:4
**organize (1)**
12:18
**origin (1)**
18:1
**Orly (64)**
5:12;6:13;7:2;9:7,
13,18;13:19,21;
15:13;16:23;17:4,12,
21;19:8;20:15;
22:12,19;24:3,4,9,
11,12;25:3,6,18,24;
26:1,9,25;27:1,1;
28:5,11,15,20;34:9,
11;42:4;43:10;
48:25;49:6;51:4,21;
53:13;54:3,6,14,17;
59:7;60:19;61:1,5,6;
62:10,13,21,23,24;
63:21;64:19,21;
68:11;71:18,23
**OSWALD (13)**
6:8;8:14,14,23;
9:1,3;45:23;48:9,10,
10,13;54:15;59:6
**others (2)**
20:12;30:25
**otherwise (2)**
42:10;47:18
**out (20)**
20:9;24:14;29:7;
30:7;39:2;40:10;
41:18;42:6;43:3,16;
45:17,18;46:1,9,21;
47:8;57:13;65:5;
69:25;72:25
**outline (2)**
50:22;67:13
**outrageous (1)**
62:6
**outweigh (1)**
52:9
**over (23)**
11:25;16:13;
22:25;27:11;30:4,
25;31:13,16;33:8;
39:16;44:5,18,25;
45:16;47:19;50:6;
51:12;52:7;53:22;
57:6;58:18;66:23;
71:21
**overview (1)**
11:6
**owed (2)**
58:18;61:18
**own (3)**
9:25;27:4;49:24
**owned (3)**
28:4;54:18;62:21

**owner (1)**
15:20
**ownership (2)**
25:8;36:2

**P**

**pages (1)**
49:17
**paid (8)**
33:20,21;34:1;
35:10;48:23;49:21;
61:14,16
**panel (1)**
31:14
**panels (1)**
64:22
**papers (3)**
11:22;16:2;56:19
**Park (1)**
4:14
**parking (2)**
35:25;36:2
**part (11)**
22:22;25:6;26:3;
57:7;59:12,25;60:2,
3,4,15;61:18
**partial (1)**
66:12
**particular (3)**
51:13;57:25;64:17
**parties (59)**
12:13;13:20;
15:19;16:17;20:2,8;
21:3,14;24:5,6,10,
17,20;29:21;30:2,17;
31:16;32:10,20;33:1,
3,11;34:9,18;37:7,
23;38:3;39:8,13;
40:6,12;41:24;44:3,
15;45:17,22;47:22;
49:22;50:22;51:9,
14;52:19;53:17;
54:10,25;55:13,18,
22;56:14;63:20;
64:14;67:1,16,17;
70:3,16,16,19,20
**parties' (2)**
43:25;67:20
**parties-in-interest (1)**
32:8
**partner (5)**
7:15;20:16,16;
36:21;64:4
**parts (1)**
38:8
**party (4)**
13:22;23:18;27:3;
67:9
**party-in-interest (1)**
10:16
**past (1)**
52:7

**Paul (1)**
58:22
**Pause (1)**
7:4
**pay (8)**
26:9;34:8;42:10;
44:14,24;61:17,24;
68:12
**payees (1)**
16:4
**payment (2)**
16:4;34:3
**pendency (2)**
56:23;67:18
**pending (26)**
11:12,13;14:4;
15:4,11;16:6,19;
18:7,12,14,17;19:5;
22:18,20;25:15;27:8,
17;32:4;35:3,4;43:1,
7;47:12,16,20;56:22
**Penn (1)**
6:4
**people (6)**
7:11;27:1;30:18;
40:22;41:3;69:20
**percent (3)**
36:22;62:13,16
**perfect (1)**
66:21
**perhaps (10)**
17:4;25:4,10;29:8,
9;31:21;33:15;
35:17;39:11;57:20
**period (2)**
25:10;39:9
**permission (1)**
20:9
**personally (1)**
45:15
**perspective (4)**
40:11;44:10;
73:21;74:14
**petition (1)**
15:11
**ph (3)**
14:7;34:18;35:12
**Piazza (8)**
7:6,7,8;19:9,18;
20:19;32:1;50:9
**picture (1)**
18:1
**pieces (1)**
11:7
**PITTA (39)**
4:8;7:12,14,14,19,
22,22,25;8:3,5,8,11;
41:6,7,7,12,12,14,16;
47:14,16;49:19;52:5,
12;63:24;64:1,1,3,7;
65:23;66:7;68:10;
70:12,12,16,24;71:3,
14;74:9

**P-I-T-T-A (2)**
7:22;41:12
**place (7)**
19:15;26:5;37:15;
38:21;46:13;47:18;
67:19
**plaintiff (3)**
21:4;22:19;57:5
**plans (1)**
57:13
**platitudes (1)**
44:12
**play (2)**
23:6;46:9
**Plaza (2)**
4:14;6:4
**please (13)**
7:21;8:22;9:9,19;
10:2;12:21;17:17;
18:23;31:5;69:22;
73:25;74:8,18
**plus (2)**
36:11;43:9
**PM (1)**
75:7
**podium (1)**
30:25
**point (10)**
34:24;41:17,18,
22;43:3;63:1;65:8;
71:16;73:23,24
**points (3)**
55:4,11,15
**policy (2)**
66:20;67:5
**Polk (1)**
58:21
**Pollack (1)**
54:4
**POLLOCK (30)**
5:11,17;9:12,12,
13;17:3,10,11,13,14,
18,19,21,24;24:8;
25:10;28:21;29:5,
13;54:5,5;56:1,4,6,8;
57:25;69:13;70:7,8,
10
**Pollock's (1)**
19:9
**portion (1)**
37:15
**position (5)**
54:21;55:16;60:8;
61:24;62:12
**positions (1)**
33:2
**possibility (1)**
15:25
**possible (3)**
45:3;58:25;59:17
**posture (2)**
14:3;33:10
**potential (10)**

15:14;21:3;29:1;
36:23;37:8;56:18,
20;66:14;72:10,12
**potentially (5)**
24:7;28:21;33:13;
44:8;67:25
**Powerball (2)**
60:14,25
**practice (1)**
18:13
**pre- (1)**
33:15
**prefer (1)**
68:6
**preference (1)**
36:14
**prejudice (1)**
61:1
**prepared (2)**
46:2;74:1
**PRESENT (3)**
6:11;33:14;66:16
**presentation (1)**
11:23;21:15;31:3
**presented (2)**
12:1;16:7
**presenting (1)**
39:25
**preserve (3)**
21:2;35:24;68:20
**preserved (2)**
34:21;66:17
**president (2)**
15:21;32:12
**press (3)**
47:8,11;67:3
**presumably (1)**
21:8
**presumption (1)**
66:25
**pre-trial (3)**
19:7,21,24
**prevent (3)**
43:6,13,13
**previously (4)**
25:17;59:10,12;
70:17
**primarily (1)**
50:17
**prior (19)**
12:24;13:8;23:12;
28:8;32:24;33:8,17;
36:6,22;37:9,10;
40:8;42:20;53:11;
61:5,6;65:5;71:22;
74:4
**priority (2)**
36:14,15
**probably (5)**
30:15;44:25;
49:16;69:2;70:1
**probate (1)**
18:10

**problem (3)**
65:20;67:25;73:18
**procedural (1)**
14:3
**proceed (15)**
22:21;24:15;
30:21;40:6;41:16;
45:12;46:2,4,15;
47:4;55:22;57:1;
62:18;70:5;74:18
**proceeding (11)**
12:24;21:25;26:3;
28:16;40:21;52:5;
54:8,9;56:18;57:2;
65:10
**proceedings (10)**
17:6;48:18;49:10,
25,25;51:12;52:16;
53:2,24;75:7
**proceeds (15)**
16:1;20:20;23:6;
24:6;33:23;36:13;
49:23;57:1;61:8,11;
62:3,10,13,16;64:25
**process (5)**
33:12;37:9;46:8,9,
13
**produce (1)**
72:14
**production (1)**
53:15
**progress (4)**
37:16,17,23;38:11
**promptly (1)**
57:2
**proper (2)**
13:22;27:3
**properly (2)**
43:10;65:1
**property (8)**
13:13;24:22,22,
24;50:8,8;54:14,15
**proposal (3)**
43:19,22;69:23
**proposed (2)**
13:9
**prosecuting (1)**
24:5
**prosecution (1)**
54:22
**prospect (1)**
44:17
**protect (1)**
50:5
**protective (2)**
72:3,8
**prove (1)**
63:10
**provide (8)**
11:21;15:24;17:5;
34:6;36:5,6,11;67:11
**provided (11)**
34:2,11;35:23;

43:23,24;58:18;
63:7;72:2,9;73:3,4
**prudent (1)**
63:19
**public (1)**
66:20
**public-art (1)**
52:10
**purchased (2)**
15:22;35:12
**purposes (1)**
47:10
**pursing (1)**
26:25
**pursuant (5)**
48:17,22;61:12,
23;72:7
**pursue (6)**
26:19;27:3;36:23;
49:9;57:3;62:19
**pursued (2)**
24:20;49:3
**pursuing (1)**
26:23
**push (2)**
20:8;24:14
**put (10)**
29:24;37:11;
39:10;44:20;47:6,
12;50:24;53:22,23;
69:7
**putting (1)**
29:17

**Q**

**quash (1)**
22:1
**quick (1)**
16:15
**quickly (2)**
39:6;51:5
**quite (4)**
32:18;36:3;50:18;
73:21
**quote (1)**
64:19
**quote-unquote (1)**
52:17

**R**

**raise (4)**
29:10;70:13;71:8;
73:22
**raised (1)**
36:19
**reach (2)**
39:11;44:5
**reached (10)**
20:21;26:6;32:15,
24;33:17;37:8;
42:23;44:9;45:17;

67:12
**read (2)**
11:7,22
**ready (1)**
46:10
**real (1)**
44:17
**really (18)**
12:2;22:9;23:11;
29:9,20;33:2,3;
37:24;41:21;42:2,
11;50:4,18;54:12;
60:16;62:6;63:16;
65:7
**reason (6)**
16:20;42:12;
55:20;62:24;67:17
**reasons (5)**
54:23;55:3;64:11;
65:4;67:5
**recap (1)**
21:18
**recapture (1)**
43:6
**receive (2)**
33:22;35:9
**received (6)**
24:17,20;43:22;
45:17;52:24;58:20
**recent (1)**
14:24
**recently (2)**
12:15;23:17
**recognize (2)**
49:22;50:13
**recognized (3)**
60:16,22,23
**recommendation (1)**
53:21
**reconveyances (1)**
24:21
**record (8)**
17:8;27:12;51:10,
25;69:2,6;70:8;
71:24
**records (3)**
71:23;72:1,15
**recover (5)**
24:6;34:16;43:8;
62:3,4
**recovered (1)**
61:23
**recoveries (1)**
28:13
**Recovery (3)**
28:3,18;29:1
**reduced (1)**
36:1
**REED (3)**
4:12;10:13;58:7
**refer (1)**
61:9
**referenced (1)**

46:24
**referral (1)**
18:6
**referred (1)**
59:20
**referring (3)**
14:10;27:17;64:24
**refers (1)**
13:24
**regard (5)**
27:12;38:25;
64:17,23;72:23
**regarding (2)**
59:23;61:1
**Reitler (1)**
9:6
**rejoicing (1)**
31:23
**related (3)**
25:24;50:17;69:1
**relates (4)**
22:1;40:16;54:16;
71:1
**relating (3)**
22:11;59:7,22
**relationship (1)**
10:22
**relevant (3)**
41:22;65:5;73:13
**relief (5)**
38:16,16,19;57:5,9
**relitigated (1)**
64:13
**remain (4)**
21:4;25:9;37:15;
67:6
**remaining (2)**
49:23;70:19
**remains (1)**
37:16
**remand (1)**
18:7
**remedies (1)**
72:12
**remember (1)**
40:23
**removal (1)**
13:11
**remove (4)**
13:9;14:1,3;15:11
**removed (3)**
12:25;13:17;37:15
**repeat (1)**
40:18
**replete (1)**
52:23
**report (2)**
72:1;73:2
**reported (1)**
33:10
**represent (7)**
8:16;9:25;10:2;
17:11,22,24;36:21

**representations (2)**
71:19;73:2
**represented (2)**
28:11;34:20
**representing (2)**
7:24;8:10
**represents (2)**
24:10;27:5
**request (1)**
45:23
**requested (2)**
49:11;51:11
**requests (3)**
51:11,13;53:14
**resolution (5)**
55:7,8,8;63:21;
74:24
**resolve (2)**
50:23;74:12
**resolved (4)**
22:4;38:6;43:20;
51:8
**Resources (5)**
15:20,22;42:10;
53:6;59:19
**respect (10)**
22:21;25:7;37:9,
21;46:5;53:13;
66:20;67:15;68:3,4
**respects (1)**
35:1
**respond (4)**
12:3;41:25;49:25;
64:4
**responded (3)**
18:14;45:22,24
**response (4)**
43:22;45:5,7;
65:23
**rest (1)**
50:25
**result (2)**
16:1;60:19
**resulted (1)**
59:24
**retention (1)**
37:3
**retired (1)**
44:4
**review (1)**
51:10
**revisions (1)**
30:3
**right (80)**
7:2,9,23;8:7,17;
9:5,8,19,23;10:8,11,
22;11:1,3,11,16;
14:12,24;15:1,7;
16:10,25;17:7;
18:15;19:10,20;20:4,
11,23;21:7,20;22:7;
25:13;27:13,22;29:3,
16;30:14;31:5;32:7,

20;34:15;36:2,8,13;
38:23;40:4,14;41:6;
42:6;45:7;47:13;
48:4,6,8;51:16,20;
52:22,25;54:2,3;
55:25;56:7,10;
57:19;58:4;61:22;
63:13;64:8;67:2,22;
70:9,25,25;71:5;
72:16;73:22;74:3,5,
17
**rights (5)**
26:12;27:3;39:14;
50:8;66:17
**rise (2)**
32:5;39:18
**risks (1)**
66:13
**Rocco (5)**
7:5;11:14;19:1;
30:20;65:18
**Rodriguez (2)**
69:22;74:18
**rolling (1)**
32:2
**Ron (1)**
13:8
**Rosenblatt (1)**
9:7
**rule (1)**
32:17
**ruled (1)**
64:18
**rules (1)**
71:1
**rulings (4)**
64:15,20;65:5;
67:19
**run (1)**
50:16
**running (1)**
61:20
**rush (1)**
30:6

**S**

**sad (1)**
62:25
**Safety (8)**
23:20,23;24:4,9;
26:23;54:10;56:2;
62:11
**saga (2)**
22:23;42:25
**Sagi (47)**
4:3;6:12;7:16,25;
19:8;22:1,13,14;
25:18,19,25;26:2,9,
10,17,20,25;27:10,
21;32:8;33:11;34:3,
4;35:20;36:19,23;
38:5,13;41:8;44:15;

48:22,24;52:4,19;
53:10;59:8;60:7,13,
17,19,24;62:2,9,12;
71:14,22;72:2
**S-A-G-I (1)**
8:5
**Sagi/Genger (1)**
61:5
**Sagi's (1)**
48:14
**same (5)**
14:5;53:12;57:13;
62:19;63:8
**Satija (1)**
13:8
**satisfaction (1)**
29:12
**satisfied (1)**
57:3
**saying (1)**
73:24
**scenario (1)**
50:3
**schedule (7)**
38:24;39:1;45:13;
46:5,5,12;67:8
**scheduled (1)**
19:7
**schedules (2)**
45:7;50:14
**scheduling (2)**
40:1;70:5
**scope (1)**
16:12
**second (5)**
7:20;12:9;22:14;
25:21;64:22
**seconds (1)**
63:16
**secured (3)**
34:12,14;37:19
**seek (1)**
38:23
**seeking (1)**
20:19
**SEGAL (4)**
6:2,2;8:15,15
**S-E-G-I (1)**
8:4
**send (1)**
39:2
**sending (1)**
14:21
**sense (3)**
12:17;21:15;
30:16;40:15,19;
55:20,21
**sent (1)**
46:18
**separate (9)**
24:10,25;25:5;
26:4,6,17,19;37:3;
64:21

48:22,24;52:4,19;
53:10;59:8;60:7,13,
17,19,24;62:2,9,12;
71:14,22;72:2
**separately (3)**
20:14;34:16;55:14
**September (1)**
35:15
**serious (1)**
73:21
**seriously (1)**
32:19
**serve (3)**
45:14,21;56:18
**served (10)**
20:25;22:2;46:1,3,
7,11;53:10,10,12,13
**service (1)**
20:2
**set (1)**
75:1
**settled (1)**
58:17
**settlement (75)**
16:2;20:21;23:6;
24:6;28:12;32:15,17,
24;33:4,5,8,13,17,19,
21;34:2,21,22;35:7;
36:7,18;37:2,8,10,
14,18,21;38:6;39:11,
13,25,25;40:2;42:5,
21,23;44:1,5,6,8,12,
13,18;45:2;46:9;
47:17,23;48:1,17;
49:5,21;50:22;
52:25;53:4;54:13,
16;56:20;58:23,24;
59:2,3,5,13,14,21,23;
61:3,6;62:3,9,13,16;
66:14,19;67:12
**settlements (1)**
39:15
**settling (1)**
34:8
**seven (1)**
59:7
**seventeen (1)**
24:19
**several (1)**
32:18
**shame (1)**
50:18
**share (3)**
59:5,11;62:18
**shares (15)**
15:22;25:25;26:8;
48:25;51:2,3;54:16,
17,17;59:7,8,10,24;
61:2;64:20
**shield (1)**
60:10
**short (2)**
31:3;55:4
**shortly (5)**
35:14;59:21;
60:23;61:2;62:1
**showed (1)**

71:18
**sic (15)**
8:4;15:20;22:24;
25:19;26:1;37:3;
43:2;44:22;49:13;
50:12;51:21;52:5;
67:10;69:10;72:13
**sic- (1)**
49:20
**side (5)**
15:15;35:20;
38:10;49:22;58:23
**sideshows (1)**
46:25
**signed (2)**
14:23;19:15
**significant (1)**
37:17
**silly (1)**
68:24
**simply (5)**
21:2;39:16;60:22;
65:8;66:2
**sitting (3)**
13:18;14:1;22:4
**situation (2)**
62:25;69:19
**sixteen (1)**
71:24
**Skadden (2)**
34:20;58:22
**skeptical (1)**
44:2
**skeptically (1)**
55:6
**skinnied-down (1)**
49:15
**sleeves (1)**
32:2
**sold (2)**
59:10,12
**solely (1)**
64:19
**somebody's (1)**
16:13
**somehow (1)**
64:24
**somewhere (1)**
52:19
**son (3)**
26:6;48:19;60:4
**Sorry (25)**
7:19;8:2;10:1,14;
11:3,18;12:8,8,8,20;
14:19,20;17:13,13,
14;19:10;23:22;
41:10,12,13;51:22;
65:16;72:21;73:15,
16
**sought (1)**
62:2
**sounds (1)**
71:2

**Southern (7)**
11:12;13:1,10,16;
19:17;42:24;52:20
**spanning (1)**
31:16
**sparsely (1)**
44:12
**speak (9)**
14:7;17:17;20:3,
13;21:6,9,16;38:23;
39:8
**SPEAKER (2)**
18:24,25
**speaking (3)**
17:16;27:24;35:7
**speaks (1)**
66:7
**specifically (1)**
73:12
**speed (1)**
32:22
**spell (2)**
9:8,19
**spelled (1)**
23:25
**spend (1)**
11:9
**spent (1)**
73:1
**spoke (2)**
13:18;36:25
**spoken (2)**
22:9;45:15
**spots (2)**
35:25;36:2
**spouse (1)**
10:25
**spread (1)**
62:19
**stab (1)**
30:1
**stagnant (1)**
21:4
**stake (1)**
66:4
**stand (8)**
11:6;46:14;56:2;
69:8,13,14;70:3;
74:25
**standing (4)**
13:22,25;27:3;
54:11
**start (6)**
11:5;17:16;32:7,
21;33:3;66:25
**started (6)**
12:23;16:18;18:5;
19:13;32:2,2
**starting (1)**
62:1
**state (6)**
14:5;15:5;16:8;
27:19;65:7;67:20

**state- (1)**
31:21
**state-court (3)**
11:8;32:3;36:25
**stated (2)**
60:24;67:6
**statements (2)**
51:15;64:4
**status (11)**
11:11,11;19:24;
29:22;40:10;45:25;
67:9,15,17,21;68:4
**statute (1)**
13:11
**statute-of- (1)**
21:2
**statute-of-limitations (1)**
47:10
**stay (9)**
24:7,13;25:10;
28:22;37:25;53:25;
55:2,2;67:6
**stayed (5)**
25:9,16;26:15,17;
29:8
**steal (1)**
60:9
**stemming (1)**
54:13
**step (1)**
37:12
**steps (1)**
74:20
**still (5)**
33:25;35:2,2;
61:18,20
**stipulation (3)**
13:24;14:22;70:18
**stock (1)**
48:19
**stolen (1)**
64:24
**stop (1)**
48:1
**storage (2)**
35:25;36:2
**straight (1)**
14:2
**Street (1)**
5:13
**Strine (4)**
60:13,16,22,23
**strongly (1)**
29:9
**structure (1)**
37:14
**stuck (1)**
45:9
**studied (1)**
22:9
**study (1)**
23:11
**stuff (2)**

**47:6;74:23**
**style (1)**
40:10
**styled (1)**
38:18
**submissions (1)**
40:9
**submit (3)**
56:15;68:6;74:9
**submitted (1)**
70:21
**subpoena (5)**
22:1,2;27:19;
53:10,13
**subpoenas (8)**
39:2;45:18,19,21;
46:1,3,7,11
**subsequent (1)**
49:5
**substance (1)**
47:19
**subtract (1)**
58:19
**success (1)**
66:8
**successor (5)**
7:7;17:24,25;
19:19;63:5
**sue (1)**
73:7
**suggest (1)**
45:12
**suggestion (4)**
14:8;51:15;56:14;
67:8
**Suite (1)**
5:5
**summaries (1)**
49:11
**summarizing (1)**
17:1
**summary (7)**
29:19;31:1;49:12,
15;51:15;69:7;70:2
**summer (2)**
41:23;45:5
**supplement (1)**
27:12
**supposed (1)**
60:18
**supposedly (1)**
45:6
**Supreme (2)**
22:10;27:19
**Sure (11)**
16:16;17:15;22:3;
30:3;31:21,23;
49:10;56:6;58:4;
64:6;73:17
**surprisingly (1)**
60:25
**surrogate (8)**
15:3;16:6,9,10,20,

24;21:18;27:16
**surrogate-court (7)**
12:7,25;13:9;
15:17;16:18;17:5;
29:21
**Surrogate's (8)**
15:5;16:12,14;
18:2,3,8,9,9
**system (1)**
66:11

---

**T**

**table (1)**
62:19
**tabled (2)**
29:3,5
**tactic (1)**
39:16
**tactics (3)**
39:3;53:19;62:7
**talk (4)**
59:6,16;70:5;74:1
**talked (3)**
29:2;41:19;69:15
**talking (8)**
18:16;51:3;54:12;
58:8,21,24;59:17;
69:5
**targets (1)**
37:8
**Tarter (5)**
7:6;11:15;19:2;
31:2;65:18
**team (2)**
33:11;36:19
**TEDCO (2)**
20:19;24:2
**telling (1)**
40:12
**ten (2)**
31:17;33:20;55:5;
59:6
**tend (1)**
64:13
**term (1)**
50:4
**terminate (1)**
47:24
**terms (3)**
33:5,9;39:25
**terrible (1)**
44:10
**terrific (3)**
48:6;58:2;70:11
**testified (1)**
53:1
**Texas (15)**
12:24,24;13:4,14,
15;19:15;35:12;
44:9;45:9,18,19;
52:15;63:4,9;71:17
**thanking (1)**

56:12
**thanks (5)**
11:3;48:6;58:2;
74:19;75:6
**That'd (2)**
17:9;32:5
**that're (1)**
34:24
**theoretically (1)**
34:15
**theory (1)**
65:24
**thereabouts (1)**
28:19
**thereafter (4)**
21:16;26:12;
35:14;40:2
**therefore (1)**
72:25
**therein (1)**
23:19
**there'll (1)**
30:3
**there're (4)**
11:7;30:14;33:24;
38:7
**thinking (1)**
40:16
**third (1)**
34:16
**third-party (1)**
10:15
**thirteen (2)**
40:16,17
**thirty-three (1)**
36:22
**thirty-two (11)**
23:7;24:18,19;
42:3,7;43:8,15;
54:12;64:17;66:4,15
**THOMAS (6)**
4:8;7:14;41:7,12;
64:1;70:12
**thoroughly (2)**
63:3,4
**thought (3)**
31:5;68:11,25
**thousands (1)**
31:13
**threatened (1)**
73:6
**three (12)**
19:5;21:18;22:25;
27:17;33:6;34:17,19,
25;45:9,10,16;69:25
**threshold (1)**
56:24
**thrown (1)**
58:12
**ticket (2)**
60:14,25
**tied (1)**
53:8

**till (1)**
19:16
**times (4)**
22:24;44:4;45:16;
50:7
**timing (2)**
47:9;69:16
**timingwise (1)**
69:11
**today (16)**
7:11;9:14;11:19;
12:10;18:12;29:6;
38:6;46:2,14;61:20;
63:5;71:6,13,15;
73:22;74:22
**together (11)**
7:15;13:23;29:17,
18,24;30:9;42:19;
69:7,18;70:4;74:25
**TOGUT (2)**
6:2;8:15
**TOKAYER (20)**
5:8;9:24,24;10:3,
5,7,9;12:15;21:10;
56:10,11,11;57:16,
18,20,22;58:1,3;
69:11,16
**Tokayer's (1)**
21:6
**TOKER (1)**
5:2
**told (3)**
20:25;38:22;52:5
**took (4)**
19:15,16;32:18;
67:19
**TORRES (1)**
4:20
**total (1)**
33:25
**touch (1)**
74:18
**towards (1)**
74:24
**TPR (10)**
4:3;7:16,25;8:11;
22:15;41:8;52:4;
59:9,15;65:1
**Trans (1)**
59:19
**transaction (2)**
48:21;53:1
**transactions (1)**
49:2
**transcript (1)**
17:15
**transfer (11)**
13:12;19:14,15;
23:7;33:18;38:14,17,
18;42:19;44:21;
72:23
**transferees (1)**
41:24

**transferred (12)**
13:7,15;32:16,17;
38:12;42:5,24;
43:16;45:10;49:13;
62:4,6
**transfers (3)**
26:24;46:21;49:4
**Trans-Resources (1)**
48:15
**travel (2)**
71:23;72:1
**TRI (5)**
15:20,22;25:25;
59:20;64:20
**trial (2)**
33:16;46:5
**tried (2)**
11:25;38:7
**trigger (1)**
30:9
**Trump (22)**
15:20;16:4;25:1;
33:23,23;34:1,3,6,6,
7,15,19;35:3;36:10;
52:25;58:17,24;
59:10,19,20;61:2,6
**Trumps (6)**
48:21,23;49:3,6,
21,23
**Trust (42)**
5:12;9:13,18;
16:23,23;17:4,12,21;
20:18,20;24:2,3,5,
11,24;25:3,5;26:2,2,
18,25;28:5,15,20;
48:24,25;51:4;54:3,
6,14,17;59:7;60:2,3;
61:1,7,8,8,12,23;
62:14,21
**trustee (50)**
7:7;11:5,15;12:25;
13:8,8,20,22;15:12;
17:24;18:14;19:2,9,
19,23;21:5;22:20;
24:10,12;27:2;29:2;
32:15,24;33:18;
35:22;36:6,22;37:9,
24;38:1,2;39:19;
42:20;43:18,19,20,
21,23,24;44:1;47:22;
49:15;50:21;53:22;
63:4,5,8,9;66:9;
71:22
**trustees (2)**
34:5;63:6
**trustee's (10)**
30:1;31:12;33:8;
37:10;39:6,16;
41:19;45:1;50:12;
56:20
**trusts (3)**
18:4;34:5;48:18
**try (13)**

20:8;31:2;37:12,
13;38:22;39:16;
51:18;60:9;62:22;
68:20,25;69:12;
73:21
**trying (12)**
23:4;33:7;35:4;
44:1;45:1;50:5;
60:17,24;62:15,18;
68:24;69:7
**tune (1)**
50:6
**turn (2)**
30:23,25
**turned (3)**
27:1;51:12;71:21
**turnover (11)**
41:25;43:1;46:15,
18;47:2;50:10;62:9;
65:9;66:2,6,9
**turnover-motion (1)**
44:21
**twelve (2)**
27:11,16
**twenty (6)**
43:5;48:16;50:17;
52:7;58:18,20
**twenty-five (1)**
49:17
**twenty-seven (1)**
59:11
**twice (1)**
64:18
**two (30)**
11:17;12:5,25;
13:9,12,17;21:18;
22:10,25;23:10;24:1,
10;27:9,16,19,21;
33:6,24;34:14;36:24,
25;37:24;40:9;
53:15;62:4;63:16;
66:6;67:9;69:24;
70:1

**U**

**UCCs (1)**
34:12
**ultimate (1)**
66:3
**ultimately (4)**
35:5;50:24;58:17;
59:14
**unable (1)**
44:5
**unanimously (1)**
64:21
**under (7)**
13:25;24:23;
34:22;36:15;39:14;
52:24;71:23
**unfortunately (1)**
38:4

**UNIDENTIFIED (2)**
18:24,25
**uniform (1)**
31:20
**UNISON (1)**
75:5
**units (2)**
35:25;36:3
**unless (2)**
14:8;28:13
**unlike (2)**
43:4;52:4
**unreasonable (1)**
66:19
**up (17)**
14:21;16:13,14,20,
24;22:24;32:2,22;
34:10;45:25;46:12;
50:16;53:8;55:15;
57:11;68:1;71:13
**update (1)**
67:15
**updates (2)**
67:9;68:4
**upon (3)**
38:25;51:10;53:13
**upset (1)**
49:2
**use (2)**
39:15;60:11
**used (4)**
50:4;60:8;61:17,
24
**using (1)**
62:20
**usually (1)**
66:5

**V**

**vacation (1)**
45:7
**valid (3)**
26:11;35:8;45:19
**valuable (1)**
36:3
**value (5)**
20:8;35:19,25;
38:2;50:18
**various (13)**
15:18;17:1;24:5;
34:5;49:24;51:11;
64:16;69:7;70:5,16,
16;73:13;74:20
**venue (6)**
38:14,19;42:20;
45:10;47:21;52:21
**vexatious (1)**
53:18
**view (3)**
16:16;30:5;57:6
**viewed (1)**
37:10

**views (3)**
67:11,20;70:3
**violated (1)**
74:4
**violation (2)**
28:22;72:9
**violations (1)**
72:11
**virtually (1)**
64:14
**virtue (1)**
36:1
**Vyskocil (2)**
23:17;27:20

**W**

**Wachtel (1)**
28:10
**wait (1)**
15:3
**waiting (2)**
23:10;56:19
**waive (1)**
36:13
**walk (2)**
30:17;74:20
**walking (1)**
29:20
**warranted (1)**
66:22
**waste (1)**
53:6
**waters (1)**
39:20
**way (8)**
16:8;28:25;30:18;
31:17;33:5;40:6,21;
74:5
**wealth (4)**
60:1,10,15,18
**weeks (7)**
33:12;40:9;53:15;
67:9;69:24;70:1,1
**weeks' (1)**
49:14
**Weiss (1)**
58:22
**weren't (1)**
44:16
**Western (1)**
13:4
**whatnot (1)**
42:22
**what's (6)**
8:9;10:22;16:10,
19;41:21;56:16
**whenever (1)**
67:10
**Whereupon (1)**
75:7
**wherever (1)**
62:22

**whoa (3)**
7:18,18,18
**whole (2)**
55:18;73:8
**who's (9)**
8:24,24;17:16;
26:5;27:9,10;34:13;
50:24;71:15
**wife (1)**
26:5
**wife's (1)**
60:4
**Willin (1)**
51:22
**willing (1)**
47:6
**willingness (1)**
69:6
**win (2)**
44:24;66:9
**wins (1)**
62:18
**wish (5)**
30:15;41:16;58:5;
63:13;65:12
**Within (3)**
32:1;33:12,20
**without (2)**
68:6;69:20
**witness (1)**
71:17
**Wlodinguer (8)**
8:18,18,20;9:6,6,
10;51:24;52:2
**W-L-O-D-I-N-G-U-E-R (1)**
9:10
**Woldinguer (1)**
52:2
**Wolinger (1)**
51:21
**word (1)**
60:11
**words (1)**
68:11
**work (12)**
29:17;32:12;33:1;
39:10,17;43:18;
67:16;69:12,23;
70:6;72:12;74:24
**worked (4)**
13:23;24:8;43:22;
50:8
**working (3)**
29:13;36:4;50:22
**world (2)**
53:16;57:12
**worries (1)**
12:22
**worth (1)**
35:21
**write (1)**
55:9
**wrong (3)**

41:19;47:21;73:25
**wrote (3)**
40:25;41:2,2

## Y

**year (2)**
41:23;61:6
**years (26)**
11:25;23:1,10;
27:11;31:13,14,16,
18;37:24;39:4;
41:20,21;43:5;44:5;
48:16;49:4,7;50:17;
52:8,12;55:5;58:23;
60:12;64:12;66:24;
71:24
**yesterday (1)**
38:4
**York (18)**
4:6,15,23;5:6,15;
6:5;11:12;13:10,16;
15:4;19:12;22:3;
27:19;45:20;46:1;
49:14;52:20,22

## Z

**Zeichner (2)**
28:9;68:16

## 1

**1,000,000-dollar (1)**
33:19
**1:51 (1)**
75:7
**10 (1)**
59:13
**10.3 (1)**
48:24
**10.7 (1)**
59:13
**10004 (2)**
4:15;5:15
**10019 (1)**
4:23
**10119 (1)**
6:5
**10170 (1)**
5:6
**10271 (1)**
4:6
**11th (1)**
19:17
**120 (1)**
4:5
**13895 (1)**
7:3
**15 (1)**
33:25
**1633 (1)**
4:22

**16th (1)**
53:15
**17.3 (2)**
26:19;61:16
**18th (1)**
14:23
**19- (1)**
7:2
**1993 (1)**
5:12
**1-million- (1)**
35:6

## 2

**2.4 (1)**
35:21
**2.5 (1)**
35:22
**200,000 (2)**
36:6,12
**2004 (1)**
26:2
**2008 (1)**
48:21
**2009 (1)**
16:18
**2012 (2)**
35:12;61:5
**2013 (10)**
20:22;24:6;28:12;
34:2;35:12;42:5;
49:4;54:13;61:3,3
**2016 (2)**
35:15,15
**2018 (1)**
25:20
**2019 (5)**
13:2,4;25:21;
26:14;28:5
**20th (1)**
28:19
**23rd (1)**
52:16
**2400 (1)**
5:5
**24th (1)**
5:14
**250,000 (1)**
33:19
**26.7 (1)**
48:23

## 3

**3.5 (2)**
25:22;35:21
**30th (1)**
24:14
**31st (2)**
55:3;56:4
**32.2 (1)**
49:20

**32.3 (3)**
46:23;59:3,16
**32.3- (1)**
16:1
**32.3-million-dollar (2)**
20:20;46:20

## 4

**4.5 (3)**
34:13;35:9;61:19
**420 (1)**
5:4

## 5

**5.4 (1)**
34:18
**5th (1)**
19:16

## 6

**60 (1)**
5:13

## 7

**7 (2)**
7:7;51:16
**7.4 (2)**
49:1;59:13
**7.5 (1)**
33:24
**7.5- (1)**
62:4
**750,000 (3)**
33:21,22;35:10
**7th (11)**
19:25;33:15;
39:23;40:8;56:3,4,8;
57:14;67:10;69:16,
25

## 9

**9019 (1)**
47:25